STATE OF NORTH CAROLINA v. ELDRED LEON HILL

No. 599A82

(Filed 28 August 1984)

**1. Homicide § 18.1— first-degree murder—sufficiency of evidence of premeditation and deliberation**

In a prosecution for first-degree murder, there was sufficient evidence of premeditation and deliberation where the evidence tended to show that an officer stopped to investigate a suspicious vehicle; as he looked into the window of the car, a black man appeared and took off running; the officer on two occasions said something, but the man kept on running; the officer ran after him and tackled him; as the two struggled, the man managed to get up; the officer was still on the ground; the black man, who had possession of the gun, was "looking down at his face and . . . said something like 'let me go' "; a shot was fired and the officer fell to the ground; immediately following the shooting, the man turned and pointed the gun at another man, an eyewitness, who was seated in his automobile at the time; and the black man then fled the scene in the blue GTO "going faster than the speed limit."

**2. Homicide § 30.3— failure to instruct on involuntary manslaughter proper**

The trial judge properly failed to instruct on involuntary manslaughter where the evidence tended to show that in the course of a struggle in which defendant was trying to get away from a police officer, defendant stood up and looked down at the officer; at that point defendant said "let me go" and a gun in his possession went off; the gun was pointed at the officer and was fired at extremely close range; the officer fell to the ground and immediately thereafter defendant turned toward an eyewitness and pointed the gun at him; and the defendant then fled the scene in a blue GTO. There was no evidence of an unintentional discharge of the weapon.

**3. Criminal Law § 102— closing argument—not so improper as to require trial court to take corrective action on its own motion**

There was nothing so grossly improper in the prosecutor's closing argument as to require the trial court to have taken corrective action on its own motion. The challenged portions of the argument were either supported by the evidence or reasonable inferences therefrom or they were of the same nature as arguments already found by the Court not to be grossly improper *per se*.

**4. Criminal Law § 102.8— argument in penalty phase—comment on failure to testify—not requiring trial court to act on own initiative**

A prosecutor's challenge to defendant's evidence, put on during the penalty phase of the trial, that defendant had become a born-again Christian while in jail awaiting trial was not so grossly improper as to require the trial court's acting on its own initiative to instruct the jury that defendant had the right not to testify even though the argument may have tended to comment upon defendant's failure to testify.

**5. Criminal Law § 102.12— comment on deterrent effect of death penalty in argument**

A prosecutor's argument during the penalty phase of the trial which referred to the deterrent effect of the death penalty was not so egregious as to warrant *ex mero motu* action by the court.

**6. Criminal Law § 135.10— proportionality review of death sentence—finding that sentence of death disproportionate**

Given the somewhat speculative nature of the evidence surrounding the murder, the apparent lack of motive, the apparent absence of any simultaneous offenses, and the incredibly short amount of time involved, together with the jury's finding of three mitigating circumstances tending to show defendant's lack of past criminal activity and his being gainfully employed, and the unqualified cooperation of defendant during the investigation, the death sentence imposed in this prosecution for first-degree murder of a police officer was disproportionate within the meaning of G.S. 15A-2000(d)(2).

Justice EXUM dissenting in part and concurring in part.

Justice MEYER dissenting.

Justice MITCHELL and Justice MARTIN join in this dissenting opinion.

Justice MITCHELL concurring in part and dissenting in part.

Justice MEYER and Justice MARTIN join in this opinion.

APPEAL by defendant from the judgment of *Thornburg, Judge,* entered at the 27 September 1982 Criminal Session of HENDERSON County Superior Court.

Defendant was charged in a bill of indictment, proper in form, with the first-degree murder of Dennie Enevold. Defendant entered a plea of not guilty.

At the guilt determination phase of the trial, the State offered evidence tending to show the following:

Deborah Kitchen, a friend of defendant, owned a dark blue Pontiac GTO which had no rear hubcaps. She loaned the car to defendant on Saturday evening, 21 November 1981, so that he could go to Hendersonville. Ms. Kitchen testified that the keys to the GTO were on a key ring to which an orange Coke bottle ornament was attached. The ornament had a picture of a green marijuana leaf on it. The witness also testified that defendant owned a big green comb.

Sonny Martin testified that he saw defendant at about 2:30 a.m. Sunday, 22 November 1981, in a neighborhood pub in Hen-

dersonville called "Allen Brown's." Defendant went with Sonny and two sisters, Barbara and Linda Waters, to Waffle World to eat. The group then returned to Allen Brown's at approximately 3:15 a.m. and let defendant out at a blue car. Defendant asked Linda Waters what she was going to do, and upon her reply that she was going home, defendant said, "I might be down there." Linda Waters lived on Woodcock Drive.

Anthony McMinn, who lived at 710 Woodcock Drive next door to Linda Waters' house, testified that shortly before 5:00 a.m. on 22 November 1981, he was awakened by the ringing of his doorbell. He got up and saw a man standing at the door and a blue GTO in the driveway. After awhile, a police car drove slowly by the house, and the man went back to his car and drove off in the direction of the police car. A few minutes later, McMinn saw flashing blue lights and heard a shot.

Earlier that evening, Dennie Enevold, a Hendersonville police officer, had left home to begin work as one of three officers assigned to third shift. Shortly before 5:00 a.m., he radioed the station that he was at the intersection of Ash and Woodcock and was with a suspicious car that had been circling the block. Officer Enevold indicated that he had not obtained any identification of the driver.

Daniel Edward Gilliam, a resident of a house located on the corner of Woodcock and Ash who had just let his cat into the house, noticed a blue light flashing outside his bedroom window at about 4:45 a.m. on the morning of 22 November 1981. Gilliam got up and went to his window and saw a police officer shining his flashlight into the driver's side of an automobile parked near Southern Burglar Alarm. Gilliam testified that a man came from the direction of Southern Burglar Alarm and that the man kept running despite the officer's saying something to him. The officer then tackled the man and a struggle ensued. Gilliam heard a shot and ducked. When he looked back out the window, the officer was lying on the ground.

Also at around 4:45 a.m. on this morning, Ricky Edwards was driving down Ash Street and stopped at the traffic light at the intersection of Ash Street and 7th Avenue. He saw a blue light flashing near the intersection of Ash and Woodcock. He also noticed a blue GTO parked near the same intersection. A man "struck out running" and an "officer started chasing after him." According to Edwards, the officer tackled the man, and, as the

two came up, the man stood over the officer who was on one knee. Edwards then saw fire come from a gun and saw the officer fall to the ground. The man, described by Edwards as a black man, pointed the gun at Edwards who began to back up. At that time Edwards saw another police car drive up. The driver, Officer Kraus, had been in the neighborhood, had heard Officer Enevold's radio message about the suspicious car, and had arrived to assist Enevold. Edwards told Officer Kraus that he had just seen an officer shot. As Kraus started towards the scene, Edwards saw the blue GTO pass by them "going faster than the speed limit." Edwards noticed that the GTO had no rear hubcap on.

Officer Enevold was found lying face down in a pool of blood. Underneath his body was found an orange key chain ornament, shaped like a Coke bottle with a picture of a green marijuana leaf on it. Also discovered near Officer Enevold's body was a green comb.

Officer Enevold was transported to the hospital where he subsequently died. He had been shot at close range with his own weapon, a .38 caliber Smith and Wesson service revolver which was never found. Dr. Richard L. Landau, expert witness in the field of pathology, testified that the cause of death was a single gunshot wound to the head below the left eye.

Shortly after Officer Enevold was shot, Officer Bennett was called to the scene and given a description of the late model, dark blue GTO. After driving around the area he passed Allen Brown's and saw an automobile parked there that matched the description given to him. Unlike the other cars in the area, the GTO had no frost on either the front or the rear windshield. Officer Bennett waited for other officers to arrive and at approximately 6:45 a.m. they all entered Allen Brown's establishment. There were three black males inside and one black female. All had identification except one, the defendant. After consenting to accompany the officers to the station, defendant admitted to them that he had arrived there in the blue Pontiac GTO parked outside.

Subsequently, at the police station, defendant was placed under arrest. Hairs taken from defendant's head matched those taken from the green comb. Defendant's fingerprints were found on the blue GTO. In addition, handwipings collected from the defendant indicated traces of lead, barium and antimony consistent with his having fired a weapon.

Defendant offered no evidence during the guilt phase. The jury returned a verdict of guilty of first-degree premeditated murder.

During the sentencing phase, the State offered no additional evidence. Defendant offered evidence that he had a good reputation in the community, that he had never been in any significant trouble, that he was gainfully employed at the time of his arrest, and that since his arrest he had become a born-again Christian.

The only aggravating circumstance submitted to the jury was "whether the murder was committed against a law enforcement officer while engaged in the performance of his official duties." The jury found the existence of this factor and also found the existence of one statutory mitigating circumstance, that the defendant had no significant history of prior criminal activity. The jury in addition found two non-statutory mitigating circumstances. Nevertheless, the jury concluded that the aggravating circumstance outweighed the mitigating circumstances and recommended the death penalty.

*Rufus L. Edmisten, Attorney General, by Barry S. McNeill, Assistant Attorney General, for the State.*

*Adam Stein, Appellate Defender, by Ann B. Petersen and James R. Glover, Assistant Appellate Defenders, for defendant-appellant.*

BRANCH, Chief Justice.

[1] Defendant first assigns as error the denial of his motions to dismiss the charge of first-degree murder on the ground that there was insufficient evidence of premeditation and deliberation.

In *State v. Corn,* 303 N.C. 293, 278 S.E. 2d 221 (1981), we stated the familiar standards governing the sufficiency of evidence of premeditation and deliberation:

In order for the trial court to submit a charge of first degree murder to the jury, there must have been substantial evidence presented from which a jury could determine that the defendant intentionally shot and killed the victim with malice, premeditation and deliberation. *State v. Horton,* 299 N.C. 690, 263 S.E. 2d 745 (1980); *State v. Heavener,* 298 N.C. 541, 259 S.E. 2d 227 (1979); *State v. Baggett,* 293 N.C. 307, 237 S.E. 2d 827 (1977). "Substantial evidence" is that amount of

relevant evidence that a reasonable mind might accept as sufficient to support a conclusion. *State v. Smith,* 300 N.C. 71, 265 S.E. 2d 164 (1980); *State v. Powell,* 299 N.C. 95, 261 S.E. 2d 114 (1980). In ruling upon defendant's motion to dismiss on the grounds of insufficient evidence, the trial court is required to interpret the evidence in the light most favorable to the State, drawing all reasonable inferences in the State's favor. *State v. Fletcher,* 301 N.C. 709, 272 S.E. 2d 859 (1981); *State v. King,* 299 N.C. 707, 264 S.E. 2d 40 (1980).

> Premeditation has been defined by this Court as thought beforehand for some length of time, however short. No particular length of time is required; it is sufficient if the process of premeditation occurred at any point prior to the killing. *State v. Myers,* 299 N.C. 671, 263 S.E. 2d 768 (1980); *State v. Reams,* 277 N.C. 391, 178 S.E. 2d 65 (1970); *State v. Robbins,* 275 N.C. 537, 169 S.E. 2d 858 (1969). An unlawful killing is committed with deliberation if it is done in a "cool state of blood," without legal provocation and in furtherance of a "fixed design to gratify a feeling of revenge, or to accomplish some unlawful purpose." *State v. Faust,* 254 N.C. 101, 106-07, 118 S.E. 2d 769, 772 (1961). The intent to kill must arise from "a fixed determination previously formed after weighing the matter." *State v. Exum,* 138 N.C. 599, 618, 50 S.E. 283, 289 (1905). *See also State v. Baggett, supra; State v. Britt,* 285 N.C. 256, 204 S.E. 2d 817 (1974).

*Id.* at 296-97, 278 S.E. 2d at 223. Furthermore, as we noted in *State v. Judge,* 308 N.C. 658, 303 S.E. 2d 817 (1983),

> [t]he term "cool state of blood" does not mean that the defendant must be calm or tranquil or display the absence of emotion; rather, the defendant's anger or emotion must not have been such as to disturb the defendant's faculties and reason. *State v. Myers,* 299 N.C. 671, 263 S.E. 2d 768 (1980); *State v. Britt,* 285 N.C. 256, 204 S.E. 2d 817 (1974). The fact that there was a quarrel does not preclude the possibility that the defendant formed the intent to kill with premeditation and deliberation. *State v. Tysor,* 307 N.C. 679, 300 S.E. 2d 366 (1983); *State v. Misenheimer,* 304 N.C. 108, 282 S.E. 2d 791 (1981).

308 N.C. at 662, 303 S.E. 2d at 820.

In the instant case, the evidence, taken in the light most favorable to the State, tends to show that Officer Enevold

stopped to investigate a suspicious vehicle, and as he looked into the window of the car, a black man appeared and took off running. The officer on two occasions said something, but the man kept on running. Officer Enevold ran after him and tackled him. As the two struggled, the man managed to get up. The officer was still on the ground. The black man, who had possession of the gun, was "looking down at his face and . . . said something like, 'Let me go.' " A shot was fired and the officer fell to the ground. Immediately following the shooting, the man turned and pointed the gun at Ricky Edwards, an eyewitness who was seated in his automobile at the time. The man then fled the scene in the blue GTO, "going faster than the speed limit." This evidence was sufficient to permit the issues of premeditation and deliberation to go to the jury.

[2]   Defendant next assigns as error the failure of the trial court to instruct the jury on the lesser-included offense of involuntary manslaughter. At trial, defendant submitted a written request for a jury instruction on involuntary manslaughter. The trial court denied the request and charged the jury on the offenses of first-degree murder, second-degree murder, and voluntary manslaughter. In support of his contention, defendant argues that the evidence permits an inference that the officer's gun went off accidentally as a result of defendant's negligent handling of it. We disagree.

As we stated in *State v. Redfern*, 291 N.C. 319, 230 S.E. 2d 152 (1976),

> [i]nvoluntary manslaughter is the unintentional killing of a human being without malice, proximately caused by (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission. *State v. Ward*, 286 N.C. 304, 210 S.E. 2d 407.

*Id.* at 321, 230 S.E. 2d at 153. In the instant case, defendant did not testify or put on any evidence. The State's evidence tends to show that in the course of a struggle in which defendant was trying to get away, defendant stood up and looked down at the officer. At that point defendant said "Let me go" and a gun in his possession went off. The gun was pointed at Officer Enevold and was fired at extremely close range. The officer fell to the ground and immediately thereafter defendant turned toward Ricky Edwards and pointed the gun at him. Defendant then fled the scene in the blue GTO. There is no evidence of an unintentional dis-

charge of the weapon and hence there was no error in the failure of the trial judge to instruct on involuntary manslaughter. *See State v. Robbins,* 309 N.C. 771, 309 S.E. 2d 188 (1983).

**[3]** Defendant next contends that he was denied his right to a fair trial by the prosecutor's closing argument during the guilt phase of the trial. Defendant maintains that certain portions of the prosecutor's closing argument improperly appealed to the passions and prejudices of the jurors. Although conceding he made no objections to the challenged portions, defendant argues that the remarks were so prejudicial and grossly improper as to require corrective action by the trial court *ex mero motu.*

The rules applicable to the scope of the prosecutor's closing argument were recently summarized by this Court in *State v. Kirkley,* 308 N.C. 196, 302 S.E. 2d 144 (1983):

> Prior to discussing the merits of each contended error during the prosecutor's argument to the jury, we must set forth the standard of review to be employed. The defense counsel at trial failed to object to or take exception to any part of the prosecutor's final argument to the jury. If a party fails to object to a jury argument, the trial court may, in its discretion, correct improper arguments. *State v. Johnson,* 298 N.C. 355, 259 S.E. 2d 752 (1979). When a party fails to object to a closing argument we must decide whether the argument was so improper as to warrant the trial judge's intervention *ex mero motu.* We are therefore reviewing the judge's action and must decide if he abused his discretion. In *State v. Johnson,* 298 N.C. 355, 259 S.E. 2d 752 (1979), Chief Justice Branch stated:
>
> > In capital cases, however, an appellate court may review the prosecution's argument, even though defendant raised no objection at trial, but the *impropriety* of the argument must be *gross* indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it.
>
> 298 N.C. at 369, 259 S.E. 2d at 761. (Emphasis added.)
>
> *        *        *        *
>
> In North Carolina it is well settled "that counsel is allowed wide latitude in the argument to the jury." *State v.*

---
---

*Johnson,* 298 N.C. 355, 368, 259 S.E. 2d 752, 761 (1979); see also: *State v. Covington,* 290 N.C. 313, 226 S.E. 2d 629 (1976). "Even so, counsel may not, by argument or cross-examination, place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs, and personal opinions not supported by the evidence." (Citations omitted.) *State v. Britt,* 288 N.C. 699, 711, 220 S.E. 2d 283, 291 (1975). A prosecutor must present the State's case vigorously while at the same time guarding against statements which might prejudice the defendant's right to a fair trial.

308 N.C. at 209-211, 302 S.E. 2d at 152-53.

We have carefully and thoroughly reviewed the prosecutor's closing argument in this case and we find nothing so grossly improper as to require the trial court to take corrective action on its own motion. The challenged portions of the argument were either supported by the evidence or reasonable inferences therefrom, *e.g., State v. Pinch,* 306 N.C. 1, 292 S.E. 2d 203, *cert. denied,* 103 S.Ct. 474 (1982), or they were of the same nature as arguments already found by this Court not to be grossly improper *per se. E.g., State v. Kirkley,* 308 N.C. 196, 302 S.E. 2d 144 (1983); *State v. Oliver and Moore,* 302 N.C. 28, 274 S.E. 2d 183 (1981); *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied,* 448 U.S. 907 (1980); *State v. Britt,* 291 N.C. 528, 231 S.E. 2d 644 (1977). This assignment is overruled.

[4] Defendant's fourth contention challenges the prosecutor's remarks during the penalty phase of the trial. During the penalty phase, defendant put on evidence that, while he was in jail awaiting trial, he had become a born-again Christian. During their arguments at this phase, the prosecutor and his assistant vigorously challenged the fact of defendant's conversion. Among the statements made were the following:

> I don't know lots about religion. I don't know lots about religion, but I was brought up in a Christian home, and I was always taught by my parents that you must confess your wrong, you must ask for forgiveness. And when I read the scripture, I find words similar to these: "If you will confess me before man, I will acknowledge you before my Father, who is in heaven." What does that mean? That means if a person has a real, true Christian conversion, he must be honest and sincere with himself and with his fellow man. He must confess his wrong before man and acknowledge that

before his Christ, and Jesus Christ will acknowledge him before our Heavenly Father. One of the most beautiful things that I ever learned as a youngster was the story of George Washington in chopping down the cherry tree. I don't have to repeat that. That was a story that I was taught.

I believe that the God that I know and that I have accepted can perform miracles. I believe He did perform miracles. I believe He can change a man's life. But I say that before He can change a man's life, that man must confess Him before his fellow man, and then God or Jesus will acknowledge him before God who's in heaven.

\* \* \* \*

[I]f he hasn't got a true conversion, he can get it. He's got to ask the Good Master. He's got to be sincere. He's got to have a true repentance. It doesn't take long, but you must be sincere. You must be sincere. There must be a true repentance. You must confess before man, and then Jesus Christ will confess or acknowledge you before God himself.

\* \* \* \*

I submit that there is nothing in this man's background or in his personality that can justify or outweigh what he did. And to this day, as far as we know, there's been no confession, no remorse.

Defendant maintains that, although he did not object to the above-quoted statements, they were improper comments upon his failure to testify at the penalty phase and hence were egregious enough to require corrective action by the trial court *ex mero motu*. Defendant contends that the court should have instructed the jury during the penalty phase that defendant had the right not to testify.

At the outset, we note that the well-established rules pertaining to the prosecutor's arguments during the guilt phase of the trial apply equally to the arguments during the penalty phase. *State v. Pinch*, 306 N.C. 1, 292 S.E. 2d 203. Thus, we must determine if the remarks here were so extreme or prejudicial as to require the trial court to recognize and correct *ex mero motu* "an argument which defense counsel apparently did not believe was prejudicial when he heard it." *State v. Johnson*, 298 N.C. at 369,

259 S.E. 2d at 761. We have examined the prosecutor's remarks contextually, and in light of the fact that defendant initially introduced the topic of his religious experience and thus hoped for favorable inferences flowing therefrom, we cannot say that the prosecutor's exploration of and attack on this subject was so grossly improper as to require the trial court's acting on its own initiative. *See State v. Albert,* 303 N.C. 173, 277 S.E. 2d 439 (1981).

[5] Defendant's next assignment is likewise addressed to the prosecutor's argument during the penalty phase. The bulk of defendant's argument here challenges the prosecutor's reference to the deterrent effect of the death penalty. It is well settled that criminal defendants in North Carolina may not offer evidence during the penalty phase to show that the capital punishment does not have any deterrent effect. *E.g., State v. Cherry,* 298 N.C. 86, 257 S.E. 2d 551 (1979). Similarly, we held in *State v. Kirkley,* 308 N.C. at 215, 302 S.E. 2d at 155, that it was improper for the prosecutor to argue the deterrent effect of capital punishment. Nevertheless, we held in *Kirkley* that the argument was not so egregious as to require corrective action by the trial judge *sua sponte. Id.* We likewise do not find the prosecutor's arguments here to be so offensive as to warrant *ex mero motu* action by the court.

Of the defendant's eight remaining assignments of error, seven are addressed to questions previously decided adversely to defendant and defendant so concedes. We have reviewed defendant's arguments on these questions and are not persuaded that prejudicial error occurred so as to warrant a new trial.

[6] We thus turn to the final remaining assignment of error dealing with the question of proportionality of the sentence imposed in the instant case. Pursuant to G.S. 15A-2000(d)(2), we are required in every capital case to review the record and determine

(1) whether the record supports the jury's findings of any aggravating circumstance or circumstances upon which the sentencing court based its sentence of death, (2) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factor, and (3) whether the sentence of death is excessive or disproportionate to the

penalty imposed in similar cases, considering both the crime and the defendant.

*State v. Bondurant,* 309 N.C. 674, 692, 309 S.E. 2d 170, 181 (1983). The Court thus is charged with conducting a three-pronged test, and after a careful review of the record, we find that the evidence supports the sole aggravating factor found by the jury. *See State v. Jackson,* 309 N.C. 26, 305 S.E. 2d 703 (1983). In addition, we cannot say that the jury imposed the death penalty "under the influence of passion, prejudice, or any other arbitrary factor." *Id.*

The third prong of the statutory test requires the Court to compare similar cases to determine whether the sentence here imposed is disproportionate. The now familiar "pool" of cases, as established in *State v. Williams,* 308 N.C. 47, 301 S.E. 2d 335, *cert. denied,* 104 S.Ct. 202 (1983), includes

> *all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*Id.* at 79, 301 S.E. 2d at 355. Further, we stated in *Jackson,* 309 N.C. at 45, 305 S.E. 2d at 717, that the pool "includes only those cases which have been affirmed by this Court." *Id.*

We have recognized, and continue to recognize the gravity of the duty imposed upon us by statute. As we stated in *State v. Jackson,*

> [t]he purpose of proportionality review is to serve as a check against the capricious or random imposition of the death penalty. *State v. Hutchins,* 303 N.C. 321, 279 S.E. 2d 788 (1981). We repeat that we consider the responsibility placed upon us by N.C.G.S. 15A-2000(d)(2) to be as serious as any responsibility placed upon an appellate court. *State v. Rook,* 304 N.C. 201, 283 S.E. 2d 732 (1981), *cert. denied,* 455 U.S. 1038 (1982). In carrying out our duties under the statute, we must be sensitive not only to the mandate of our legislature but also to the constitutional dimensions of our review. *Id.*

309 N.C. at 46, 305 S.E. 2d at 717.

With the magnitude and seriousness of our task in mind, we have reviewed the facts and circumstances of this case and compared them to the other cases in the proportionality pool. Our careful comparison of the cases has led us to conclude that, while the crime here committed was a tragic killing, "it does not rise to the level of those murders in which we have approved the death sentence upon proportionality review." *State v. Jackson*, 308 N.C. at 46, 305 S.E. 2d at 717.

In comparing this case "with other cases in the pool which are roughly similar with regard to the crime and the defendant," *State v. Lawson*, 310 N.C. 632, 648, 314 S.E. 2d 493, 503 (1984), we find only two such cases in which the jury found as an aggravating factor that the murder was committed against a law enforcement officer. In *State v. Hutchins*, 303 N.C. 321, 279 S.E. 2d 788 (1981), we affirmed the jury's recommendation of the death sentence. In *Hutchins*, the defendant was convicted of the murders of three police officers, two of which were first-degree murder convictions. The jury found three aggravating factors: (1) the murder was committed to avoid or prevent arrest; (2) the murder was committed against a law enforcement officer while engaged in the performance of his duties; and (3) the murder was part of a course of conduct involving crimes of violence against others. The jury found one mitigating factor: that, at the time of the crimes, defendant was under the influence of a mental or emotional disturbance.

On the other hand, the jury in *State v. Abdullah*, 309 N.C. 63, 306 S.E. 2d 100 (1983), recommended a life sentence despite having found four aggravating circumstances and only one unspecified mitigating circumstance. The defendant in *Abdullah* had conspired with five others to commit armed robbery and in the process of carrying out the robbery, defendant shot an officer who had just entered the store. *Id.*

The facts and circumstances of the instant case simply do not rise to the magnitude of those in *Hutchins* and *Abdullah*. Moreover, the great disparity of sentences in those two cases renders any meaningful comparison in this limited pool virtually impossible.

Even so, comparing this crime and this defendant to those in other cases in the entire pool in which the death penalty has been affirmed leads us to conclude that the killing in this case, though, as all murders, senseless, was not especially heinous, atrocious or cruel. *E.g., State v. McDougall,* 308 N.C. 1, 301 S.E. 2d 308, *cert. denied,* 104 S.Ct. 197 (1983); *State v. Pinch,* 306 N.C. 1, 292 S.E. 2d 203; *State v. Martin,* 303 N.C. 246, 278 S.E. 2d 214, *cert. denied,* 454 S.Ct. 933 (1981). Neither was the crime here of a torturous, sadistic or "bloodthirsty" nature. *E.g., State v. Williams,* 308 N.C. 47, 301 S.E. 2d 335; *State v. Brown,* 306 N.C. 151, 293 S.E. 2d 569, *cert. denied,* 103 S.Ct. 503 (1982); *State v. Rook,* 304 N.C. 201, 283 S.E. 2d 732. This shooting was not part of a violent course of conduct by defendant. *E.g., State v. Lawson; State v. Craig & Anthony,* 308 N.C. 446, 302 S.E. 2d 740, *cert. denied,* 104 S.Ct. 263 (1983); *State v. McDougall; State v. Smith,* 305 N.C. 691, 292 S.E. 2d 264, *cert. denied,* 103 S.Ct. 474 (1982); *State v. McDowell,* 301 N.C. 279, 271 S.E. 2d 286 (1980), *cert. denied,* 450 U.S. 1025 (1981). Nor was this shooting committed in the perpetration of another felony such as in *State v. Craig & Anthony; State v. Williams; State v. Smith,* and *State v. Rook.* Furthermore, there is no evidence that defendant coldly calculated or planned the commission of this crime over a period of time as did the defendant in *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510.

The record in this case reveals that defendant had been drinking on the evening in question, and that he apparently went out in search of one of the Waters sisters with whom he had been earlier and who lived on Woodcock. Officer Enevold noticed a suspicious car in that area and proceeded to investigate. The evidence is unclear as to what happened between the time the officer radioed his message to the station and the time at which he was shot. One eyewitness testified that the officer shone his flashlight into a car parked near the Southern Burglar Alarm Building. The record of this eyewitness's testimony reveals the following, less than crystal clear, account of the events:

Q. And at that point in time another man approached the officer from behind or from the officer's side?

A. The officer was looking in the driver's side, and this person was up on the corner—must have been coming over the fence or something because the officer didn't see him until he

hit the curb and that's when the officer saw him and that's when I seen him.

Q. At that point in time did the officer turn around and look at him? Could you tell when the officer realized he was there?

A. I can't really recall that.

Q. Could you see him coming over the fence, the man?

A. It was dark at the time and there was no place for him to have hid there unless he did come over the fence.

The testimony concerning exactly how defendant approached the officer admits of some confusion and is certainly speculative at best. Thus, there is some doubt not only as to defendant's whereabouts but also as to what he might have been doing just prior to his encounter with the officer. In addition, there is no evidence as to whether the officer drew his gun first, or whether defendant managed to grab the gun from Officer Enevold's holster in the first instance. The issue of whether or not Officer Enevold was in the process of effecting a valid arrest was not submitted to the jury. Likewise, the aggravating circumstance found in G.S. 15A-2000(e)(4), that the murder "was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody" was not submitted to the jury. Finally, the entire course of events in this case, from Officer Enevold's radio communication until Officer Kraus's message that an officer was down, lasted approximately 80 seconds.

Given the somewhat speculative nature of the evidence surrounding the murder here, the apparent lack of motive, the apparent absence of any simultaneous offenses, and the incredibly short amount of time involved, together with the jury's finding of three mitigating circumstances tending to show defendant's lack of past criminal activity and his being gainfully employed, and the unqualified cooperation of defendant during the investigation, we are constrained to hold as a matter of law that the death sentence imposed here is disproportionate within the meaning of G.S. 15A-2000(d)(2). We are therefore required by statute to sentence defendant to life imprisonment in lieu of the death sentence.

The sentence of death is vacated and defendant is hereby sentenced to imprisonment in the State's prison for the remainder

of his natural life. Defendant is entitled to credit for days spent in confinement prior to the date of judgment.

Guilt-Innocence Phase: No error;

Sentencing Phase: Death sentence vacated, sentence of life imprisonment imposed.

Justice EXUM dissenting in part and concurring in part.

I must respectfully dissent from that portion of the majority opinion which concludes that the evidence was sufficient to sustain a verdict of first degree murder on the theory of premeditation and deliberation. In order for deliberation to be present, the specific intent to kill necessary for first degree murder, as the majority notes, "must arise from 'a fixed determination previously formed after weighing the matter.'" *State v. Corn*, 303 N.C. 293, 296-97, 278 S.E. 2d 221, 223 (1981). "Deliberation means that the intent to kill was formed while defendant was in a cool state of blood and not under the influence of a violent passion suddenly aroused by sufficient provocation." *State v. Misenheimer*, 304 N.C. 108, 113, 282 S.E. 2d 791, 795 (1981). An intent to kill suddenly formed in the course of a quarrel or struggle with another and which is the product of that quarrel or struggle is not formed in a cool state of blood and cannot be the basis for a conviction of first degree murder. *State v. Corn, supra; see also State v. Misenheimer, supra.* In *Corn* this Court said:

> After carefully considering the evidence presented in the case *sub judice* in the light most favorable to the State, we find that the State has failed to show by substantial evidence that defendant killed Lloyd F. Melton with premeditation and deliberation. The shooting was a sudden event, apparently brought on by some provocation on the part of the deceased. The evidence is uncontroverted that Melton entered defendant's home in a highly intoxicated state, approached the sofa on which defendant was lying, and insulted defendant by a statement which caused defendant to reply 'you son-of-a-bitch, don't accuse me of that.' Defendant immediately jumped from the sofa, grabbing the .22 caliber rifle which he normally kept near the sofa, and shot Melton several times in the chest. The entire incident lasted only *a few moments.*

There is no evidence that defendant acted in accordance with a fixed design or that he had sufficient time to weigh the consequences of his actions. Defendant did not threaten Melton before the incident or exhibit any conduct which would indicate that he formed any intention to kill him prior to the incident in question. There was no significant history of arguments or ill will between the parties. Although defendant shot deceased several times, there is no evidence that any shots were fired after he fell or that defendant dealt any blows to the body once the shooting ended.

All the evidence tends to show that defendant shot Melton after a quarrel, in a state of passion, without aforethought or calm consideration. Since the evidence is insufficient to show premeditation and deliberation, we find that the trial court erred in instructing the jury that they could find defendant guilty of first degree murder and defendant is awarded a new trial for a determination of whether or not defendant is guilty of second degree murder, voluntary manslaughter or not guilty.

303 N.C. at 297-98, 278 S.E. 2d at 223-24.

I find the case at bar indistinguishable from *Corn.* Here, too, all the evidence tends to show defendant's intent to kill was the product of the sudden struggle in which he and deceased were engaged and was formed suddenly while defendant was "in a state of passion, without aforethought or calm consideration." In my view it was error to submit first degree murder to the jury, and I vote to remand, as we did in *Corn*, for a new trial on the question of defendant's guilt of second degree murder or manslaughter.

I concur fully in all other aspects of the majority's opinion.

Justice MEYER dissenting.

I concur in all respects with the dissenting opinion by Justice Mitchell but wish to add the following:

The United States Constitution does not require a comparative proportionality review. *Pulley v. Harris*, --- U.S. ---, 79 L.Ed. 2d 29 (1984). The requirement of a formal proportionality

review was imposed by our Legislature in the adoption of G.S. § 15A-2000(b)(2). It has become a prime feature in the appellate review of every death case, imposing a grave responsibility upon this Court which rightfully demands the expenditure of substantial effort and time in each such case. We do not treat this obligation lightly. Each case presents anew the consideration of which cases in the pool are "similar" considering both the crime and the defendant.

The majority correctly recognizes that since the enactment of G.S. § 15A-2000, in only two cases has a jury been called upon to consider imposing the death penalty for the murder of a law enforcement officer while engaged in the performance of his duties. Equally true is that in *State v. Hutchins,* 303 N.C. 321, 279 S.E. 2d 788 (1981), two additional aggravating factors were found: that the murder was committed to avoid or prevent arrest, and that the murder was part of a course of conduct involving crimes or violence against others. We affirmed the death sentence in *Hutchins.* As discussed below, I believe that the majority places undue emphasis on the fact that in *Hutchins* the jury found more than one aggravating factor and I therefore find that the present case is comparable to *Hutchins.*

*State v. Abdullah,* 309 N.C. 63, 306 S.E. 2d 100 (1983), the second case involving the murder of a police officer, is clearly distinguishable. *Abdullah* came to this Court as a life sentence case and there were no death sentence issues involved. In *Abdullah* the jury answered the issue of whether the aggravating factors were sufficient to call for the imposition of the death penalty "No" and recommended a life sentence. In *Abdullah* three codefendants who testified against Abdullah were allowed to enter pleas and later received prison sentences of no more than fifteen years and all were recommended for work release. The fact that the codefendants would not receive the death penalty was made known to the *Abdullah* jury. One of the issues at trial and brought forward on appeal in *Abdullah* concerned the credibility of the three codefendants in light of their agreement to testify in exchange for sentence concessions. *See State v. Abdullah,* 309 N.C. at 72-73, 306 S.E. 2d at 105-106. The fact that the three codefendants would not receive the death penalty was further emphasized to the jury through an additional mitigating factor which was added by handwriting on the jury form as No. XIV

in this language: "Will three co-defendants or accomplices in the crimes for which the defendant has been convicted avoid the death penalty?" In my view this was a completely improper circumstance to be included on the jury form and, had the jury form been before this Court on the direct appeal, I believe this Court would have so found. While the jury failed to answer that issue, I believe it necessarily strongly influenced the jury's decision to recommend a life sentence. I consider *Abdullah* an aberration brought about by the peculiar circumstances of that case.

Because we have no case "on point," against which to measure this case, the majority turns to the other cases in the "pool" to determine whether the death sentence in this case is proportionate. In so doing the majority imposes a standard that is neither required under the statute, nor appropriate under the circumstances.

Many of the cases in the "pool," as the majority points out, involve brutal, atrocious murders in which the victims were tortured, the bodies were mutilated, and the victims clearly underwent unnecessary physical pain and psychological suffering. Surely the majority does not intend to suggest that this sentence is disproportionate because the murder did not meet the single aggravating circumstance of being "heinous, atrocious or cruel."

Also in the "pool" are murders in which more than one aggravating factor was found. Surely the majority does not intend to hold that unless more than one aggravating factor was found, the penalty of death is not appropriate.

The statute does not require that the murder be gruesome or brutal in order to justify a penalty of death. The statute does not require that the jury find more than one aggravating factor in order to justify the penalty of death. The statute *requires* that the jury find only *one* statutory aggravating factor, that the mitigating factor or factors not outweigh the aggravating factor, and that the aggravating factor, considering the mitigating factor or factors, be sufficiently substantial to call for the penalty of death. This the jury did.

Rather than placing undue emphasis on the excessive brutality of some of our capital cases, or engaging in a numerical counting of aggravating factors, I would consider, as we did in *State v.*

*Oliver II,* 309 N.C. 326, 307 S.E. 2d 304 (1983) and *State v. Maynard,* 311 N.C. 1, 316 S.E. 2d 197 (1984), the policies underlying our capital sentencing scheme and the impact of today's decision upon the effectiveness of our criminal justice system. In *Oliver II* we did not attempt to engage in a futile comparison of all unrelated cases in the "pool." We had earlier affirmed the sentence of death in *State v. Williams,* 305 N.C. 656, 292 S.E. 2d 243 (1982), also an armed robbery case, and we simply reiterated that the sentence of death is not excessive or disproportionate when the motive for the murder is witness elimination.

Of even more significance is our recent holding in *State v. Maynard,* 311 N.C. 1, 316 S.E. 2d 197 (1984). There we noted that "the present case represents the first in North Carolina in which a potential witness, pursuant to a plea arrangement, had agreed to testify against the defendant at trial and was murdered solely for the purpose of preventing his testimony." *Id.* at 35, 316 S.E. 2d at 216. Rather than attempting to compare *Maynard* with other cases, totally unrelated on their facts, we again focused on the targeted victim, the motive for the killing, and important policy considerations. In this regard, we cited to other witness elimination cases [*Oliver II* and *State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979)]. These cases, while in most respects distinguishable from *Maynard,* as the present case is in some respects distinguishable from *Hutchins,* nevertheless shared the common thread of witness elimination as the motive for the murder. In *Maynard* we noted that "both Congress and our State legislature have recently recognized the serious consequences to the effective administration of our criminal justice system in the continuing efforts of those charged with crimes to threaten or intimidate witnesses." *Id.* at 35, 316 S.E. 2d at 216, and we upheld Maynard's sentence of death "[b]ased upon compelling policies which encourage witnesses to testify in criminal trials without fear. . . ." *Id.* at 36, 316 S.E. 2d at 216.

Here, the victim was Officer Enevold, a young police officer murdered while he was engaged in the performance of his duties. As Justice Mitchell has succinctly stated in his dissenting opinion, "[t]he murder of a law enforcement officer engaged in the performance of his duties in the truest sense strikes a blow at the entire public—the body politic—and is a direct attack upon the

rule of law which must prevail if our society as we know it is to survive." Surely the same policy considerations upon which we based our decision in *Oliver* and *Maynard* apply with equal force to this case. In the absence of compelling circumstances which would militate against a sentence of death when the victim is a police officer (and here I find none), this Court should recognize, as it has done previously in *Hutchins, Oliver,* and *Maynard,* that the effective administration of justice requires that some murders must indeed be treated as different "in kind and not merely in degree from other murders." *See* Mitchell, J., dissenting.

Finally, I feel compelled to clarify certain facts regarding this murder which leave no doubt that the jury's decision to impose a sentence of death was surely appropriate under the circumstances.

The evidence presented in this case tends to show that on the fateful morning of Sunday, 22 November 1981, at approximately 4:48 a.m., Officer Enevold radioed the Hendersonville Police Department dispatcher that he was at the intersection of Ash and Woodcock Streets, and that he was "with a suspicious car . . . reference to circling the block." Officer Enevold reported he was with the driver but had not obtained the driver's identification yet. The "suspicious car" was parked at the gate to Southern Burglar Alarm, a business on Ash Street, across from the residence of Daniel Gilliam and his family.

According to Gilliam, an eyewitness, he observed Officer Enevold out of the police car, shining a flashlight into the driver's window of the suspicious car, when a man, identified at trial by circumstantial evidence as defendant, suddenly approached from the direction of Southern Burglar Alarm, apparently by climbing over the fence. When Officer Enevold spoke to him, defendant stopped at the curb about ten feet away, and then began to run. Officer Enevold said something to him again, but defendant kept running. Officer Enevold then gave chase and tackled defendant near the middle of the intersection.

After Officer Enevold tackled defendant, they struggled in the street for a few minutes. Defendant somehow managed to obtain Officer Enevold's .38 caliber Smith and Wesson service revolver, and stood up looking down on the officer. According to Gilliam, Officer Enevold was lying on the ground with his hands

raised, apparently attempting to hold onto defendant's waist. Defendant then said something like, "Let me go," and Gilliam heard a gunshot.

Ricky Edwards, another eyewitness, testified that he saw defendant get up from the struggle and stand over Officer Enevold, pointing a gun at the officer. Officer Enevold was kneeling on one knee when Edwards saw the flash of a gunshot. Officer Enevold then fell to the ground, mortally wounded by his own service revolver.

After defendant shot the officer, he turned and pointed the gun at Edwards, who was approximately 150 to 200 feet away. Edwards stopped, put his car in reverse and backed up to the 7th Avenue intersection, where he told Officer Paul Kraus that an officer had been shot. As Officer Kraus and Edwards started toward the intersection of Ash and Woodcock, defendant sped past them in the automobile Officer Enevold had been investigating.

Officer Kraus found his fellow officer lying face down in a pool of blood.

An autopsy showed that Officer Enevold died as a result of a gunshot wound to his left cheek, just below the left eye. There were extensive powder burns on his face from the nose to the ear. The bullet was recovered from the base of Officer Enevold's neck, and the path of the bullet was slightly downward.

This evidence is sufficient to support reasonable inferences that: (1) Officer Enevold was on duty and was investigating a "suspicious car" when defendant suddenly appeared, apparently having climbed over the fence of a nearby business. (2) Officer Enevold ordered defendant to halt. However, defendant ran, trying to elude the officer. Officer Enevold again said something to defendant, but defendant continued running. (3) Defendant was trying to avoid apprehension and arrest when he ran from the scene. (4) Without escalating the confrontation by drawing his revolver or firing a warning shot to halt, Officer Enevold chased and tackled defendant in the middle of the intersection. (5) Officer Enevold was engaged in the performance of his official duty and himself did nothing to provoke the shooting. (6) During the struggle, defendant obtained Officer Enevold's service revolver, stood

up, and pointed it at the officer's face. (7) Officer Enevold was unarmed and defenseless under the circumstances. When Officer Enevold was shot, defendant had gained a superior position and advantage over the officer. He was standing, pointing the service revolver at the unarmed officer. For all intents and purposes, the struggle between defendant and the officer had ended. At that point in time, defendant literally held the officer's life or death in his hands, and chose to take it so he could escape. (8) Officer Enevold was shot by defendant at close range, while the officer was on the ground, apparently kneeling on one knee, and with his hands on or around defendant's waist; because of the location of the wound and downward path of the bullet, Officer Enevold must have been facing defendant and looking up into the barrel of his own service revolver, aware but helpless to prevent his impending death. (9) Without any signs of a struggle over the weapon or accidental shooting, defendant applied the necessary pressure on the trigger to discharge the revolver slightly downward into Officer Enevold's face. (10) Defendant shot Officer Enevold after demanding that the officer let him go, and in order to effectuate his escape. (11) Defendant then turned and pointed the revolver at Ricky Edwards, an eyewitness. (12) Defendant himself offered no assistance to the mortally wounded officer, and fled the scene without notifying the police or calling for medical attention.

Upon the foregoing facts and the reasonable inferences which may be drawn therefrom, I fail to see how the majority can overturn the death penalty imposed by the jury for the reason that the sentence is excessive and disproportionate. It clearly is not.

I would vote to affirm both the finding of guilt and the sentence of death.

Justices MITCHELL and MARTIN join in this dissenting opinion.

Justice MITCHELL concurring in part and dissenting in part.

I concur in the majority's holding that there was no error in the guilt-innocence determination phase of the defendant's trial. As I believe the death penalty entered by the trial court was proper in this case, I dissent from the action of the majority in vacating the sentence of death and imposing a life sentence.

The jury in this case specifically found as an aggravating circumstance that the murder was committed against a law enforcement officer while engaged in the performance of his official duties. G.S. 15A-2000(e)(8). The jury then found that this statutory aggravating circumstance outweighed the mitigating circumstances and that the defendant should be sentenced to death. As a result, Judge Thornburg was required to and did sentence the defendant to death.

I am not willing to say that the sentence of death in this case is excessive or disproportionate to the penalty imposed in *similar cases* considering both the crime and the defendant. G.S. 15A-2000(d)(2). Given the fact that there are almost no cases in the "pool" we use for proportionality review which involve the killing of a law enforcement officer *engaged in the performance of his official duties*, I agree with the majority that any meaningful comparison in this limited pool is "virtually impossible." Given this state of affairs, I am entirely unwilling to set aside a verdict of twelve citizens recommending death.

The murder of a law enforcement officer *engaged in the performance of his official duties* differs in kind and not merely in degree from other murders. When in the performance of his duties, a law enforcement officer is the representative of the public and a symbol of the rule of law. The murder of a law enforcement officer engaged in the performance of his duties in the truest sense strikes a blow at the entire public—the body politic—and is a direct attack upon the rule of law which must prevail if our society as we know it is to survive.

A jury having found after solemn consideration that the defendant killed a law enforcement officer engaged in the performance of his official duties and that this aggravating circumstance outweighed the mitigating circumstances and called for the penalty of death, I do not believe that we should hold the penalty disproportionate. I vote to find no error in either the verdict or the sentence of death.

Justices MEYER and MARTIN join in this opinion.