An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-463

Filed 4 February 2026

Guilford County, Nos. 20CR081384-400, 24CR028078-400

STATE OF NORTH CAROLINA

v.

DARIEN AKIN SWAIN

Appeal by defendant from judgment entered 26 April 2024 by Judge Michael D. Duncan in Guilford County Superior Court. Heard in the Court of Appeals 14 January 2026.

> *Attorney General Jeff Jackson, by Assistant Attorney General Reginaldo E. Williams, Jr., for the State.*
>
> *Christopher J. Heaney, for the defendant-appellant.*

TYSON, Judge.

Darien Akin Swain ("Defendant") appeals from judgment entered upon a jury's verdicts and convictions for first degree felony murder based upon a death occurring during the predicate felony of robbery with a dangerous weapon. The trial court arrested judgment for a predicate robbery with a dangerous weapon conviction and mandatorily sentenced Defendant to a term of life in prison without the possibility of

parole. We discern no prejudicial error.

## I. Background

### A. 1 September 2020

Andrew Dove ("Decedent") was known to illegally sell guns. On 1 September 2020, Decedent texted over cellphones with someone identified as "D" about meeting for a gun sale. On the same day, Defendant asked Roy Thomas ("Thomas") to drive him to Decedent's apartment complex. An undercover law enforcement officer was also present in the parking lot of the same complex for an unrelated investigation when Defendant and Thomas arrived.

Defendant and Thomas exited their vehicle and entered Decedent's SUV, where Decedent was sitting in the driver's seat. Defendant sat in the front passenger seat and Thomas sat in the rear seat behind Decedent. Decedent drove the group around the block for a few minutes before returning to a stop in the apartment complex's parking lot.

At approximately 2:30 pm, the officer heard a gunshot. Decedent was killed by a gunshot to the right side of his head. His injuries were "consistent with the gun being fired or discharged from the front passenger's seat," six to sixteen inches away from Decedent's head.

After hearing the gunshot, the officer saw Defendant and Thomas return to their vehicle "at a swift pace" and "accelerate[] quickly out of the parking lot." Within minutes, officers stopped Defendant's and Thomas' vehicle. When officers

approached the vehicle, Defendant had a revolver handgun in his lap. Both men were apprehended and taken into custody.

## B. The Investigation

An investigation began. Officers discovered four guns, ammunition, phones, and counterfeit currency inside the car.

Officers found a rifle, a .40 caliber Walther PPS handgun, and a Canik 9-millimeter pistol on the floorboard near Defendant's seat. Defendant had a magazine containing .40 caliber bullets in his pocket. Defendant also had fourteen counterfeit $100 dollar bills. Officers arrested both men.

Forensic analysts later examined five cellphones: one from Defendant's pocket, one from the driver's seat of Defendant's and Thomas' vehicle, two from a backpack recovered near Defendant from the vehicle, and one from Decedent. The activity history recovered from the phones showed text messages to and from Decedent's phone about meeting on the date of the murder and the gun sales. Internet searches on the phone seized from Defendant included: "Walther PPS .40" and "ammunition .40" on 17 August 2020, "2333 Floyd Street" on 27 August 2020, and "Canik 9" on 1 September 2020.

Forensic analysts examined the four firearms. One of the guns was identified as a Canik 9-millimeter pistol, matching a handwritten receipt found in Decedent's car. The revolver recovered from Defendant's lap was recognized by Decedent's wife as one of the firearms Decedent had told her he was going to sell. Another firearm, a

rifle, bore DNA consistent with Decedent's DNA. Finally, Decedent's wife also recognized the .40 caliber Walther PPS handgun.

Forensic analysts examined ballistic evidence. A shell casing found on the front passenger seat of Decedent's vehicle matched the .40 caliber Walther PPS handgun recovered from the floorboard where Defendant was seated. A bullet recovered from the vehicle was too damaged to determine whether it was fired from the .40 caliber Walther handgun, but that possibility could not be ruled out.

Examiners found and recovered DNA from four individual contributors on the Walther handgun. The only contributor identified by DNA testing was Defendant. Statistical analysis revealed it was approximately "461 octillion times more likely" that the DNA profile originated from Defendant and three unknown individuals than from four unknown individuals.

Lastly, examiners investigated Decedent's car. The fingerprints of Defendant and of one other person were found on the front passenger door. The interior of the front passenger door bore DNA from three contributors: Decedent, Defendant, and an unidentified third person.

Thomas, who was charged with accessory to first-degree murder, spoke with an officer before trial. He said someone had approached Decedent's vehicle after Decedent had driven the group around the block, and the person had talked about a gun sale. Thomas claimed he had exited Decedent's car before the gunshot occurred.

### C. Trial

A grand jury indicted Defendant for first-degree murder on 30 November 2020 and indicted for robbery with a dangerous weapon on 18 March 2024. The trial commenced on 15 April 2024.

At the end of the State's closing arguments to the jury, the prosecutor stated, "I would ask, ladies and gentlemen, that you do what the defendant through his plea of not guilty refuses to do, and that is find him accountable. Find him accountable for the shooting death of [Decedent]." Defendant's counsel did not object.

The jury found Defendant guilty of both charges on 26 April 2024. The court entered judgment on Defendant and imposed the mandatory sentence of life without parole for first-degree murder. The court arrested judgment on the conviction for robbery with a dangerous weapon. Defendant gave oral notice of appeal.

## II. Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. §§ 7A-27(b)(1) and 15A-1444(a) (2023).

## III. Issues

Defendant argues he suffered prejudicial error when the trial court failed to intervene *ex metro motu* after the prosecutor purportedly urged the jury to punish Defendant for exercising his fundamental constitutional right to a jury trial. Defendant asserts the prosecutor's comments irreparably tainted the jury and made them resent Defendant. He also asserts the comments diluted Defendant's theory of asserting reasonable doubt via Thomas' testimony, as opposed to outright denial,

making the State's argument particularly prejudicial in this case.

## IV.    Standard of Review

"The standard of review for assessing alleged improper closing arguments that fail to provoke timely objection from opposing counsel is whether the remarks were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*." *States v. Jones*, 355 N.C. 117, 133, 558 S.E.2d 97, 107 (2002) (citation omitted).

Our Supreme Court has held:

> when defense counsel fails to object to the prosecutor's improper argument and the trial court fails to intervene, the standard of review requires a two-step analytical inquiry: (1) whether the argument was improper; and, if so, (2) whether the argument was so grossly improper as to impede the defendant's right to a fair trial.

*State v. Huey*, 370 N.C. 174, 179, 804 S.E.2d 464, 468 (2017) (citation omitted). Only where a reviewing court "finds both an improper argument and prejudice will this Court conclude that the error merits appropriate relief." *Id.*

Defendant contends the prosecutor's improper remarks "tainted the jurors, so that as they deliberated, they were more likely to view the process as unnecessary than as an indispensable constitutional right." The State concedes the prosecutor's reference to Defendant exercising his right to a jury trial was "undeniably improper." *See State v. Goins*, 377 N.C. 475, 480, 858 S.E.2d 590, 594 (2021). "Therefore, we must only determine whether . . . [D]efendant has shown he was prejudiced by the

improper argument." *Id.* at 478, 858 S.E.2d at 593.

> Our standard of review dictates that only an extreme impropriety on the part of the prosecutor will compel this Court to hold that the trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument that defense counsel apparently did not believe was prejudicial when originally spoken.

*Huey*, 370 N.C. at 180, 804 S.E.2d at 470 (citation, alterations, and quotation marks omitted).

The Supreme Court of the United States has stated: "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181, 91 L. Ed. 2d 144, 157 (1986) (citation and internal quotation marks omitted). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 40 L. Ed. 2d 431, 437 (1974)). The burden is on the defendant "to show a 'reasonable possibility that, had the errors in question not been committed, a different result would have been reached at the trial.'" *Huey*, 370 N.C. at 185, 804 S.E.2d at 473 (quoting N.C. Gen. Stat. § 15A-1443(a)).

In North Carolina, "counsel is allowed wide latitude in the argument to the jury. . . [but] may not . . . place before the jury incompetent and prejudicial matters by injecting his own knowledge, beliefs, and personal opinions not supported by the evidence." *State v. Hill*, 311 N.C. 465, 472–73, 319 S.E.2d 163, 168 (1984) (citations

and internal quotation marks omitted); and *State v. Britt*, 288 N.C. 699, 711, 220 S.E.2d 283, 291 (1975)).

"When evaluating the prejudicial effect of an improper closing argument, we examine the statements in context and in light of the overall factual circumstances to which they refer." *Goins*, 377 N.C. at 479, 858 S.E.2d at 593 (citation and quotation marks omitted). To evaluate the context here, we consider the entirety of the closing argument, the evidence presented at trial, and the instructions provided to the jury. *Id.*

## V.    Analysis

Defendant argues "[t]he facts of th[is] case made the prosecutor's [statement] especially prejudicial." Defendant asserts the prosecutor's remarks were inherently prejudicial because it "misdirected the jurors" to overlook evidence unfavorable to the State's case and to instead focus on his "not guilty" plea.

The State contends the prosecutor's remarks during closing arguments did not so infect the trial with unfairness as to deny Defendant due process. The State compares this case with *Goins*. *Id.* In *Goins*, the prosecutor made multiple improper statements essentially condemning the defendant for pleading "not guilty," including, "You might ask why would [the] defendant plead not guilty? I contend to you that the defendant is just continuing to do what he's done all along, refuse to take responsibility for any of his actions." *Id.* at 477, 858 S.E.2d at 592. The defendant failed to object and the jury returned a verdict of guilty on all counts. *Id.* at 477, 858

S.E.2d at 592.

Our Supreme Court determined the defendant in *Goins* was not prejudiced by the prosecutor's improper closing argument after examining as a whole: (1) the prosecutor's arguments; (2) the evidence presented to the jury; and, (3) the instructions given to the jury. *Id.* at 479–81, 858 S.E.2d at 594–95. The State argues the same three factors also support a determination Defendant was not prejudiced by the State's comments in this case. We address each factor in turn.

The Supreme Court noted in *Goins*, the "bulk of the State's closing arguments focused on a review of the evidence . . . and the elements of the offenses charged." *Id.* at 479, 858 S.E.2d at 594. The prosecutor's improper remarks were "a small portion of the State's closing argument and was not the primary or even a major focus of the State's argument to the jury." *Id.* Here, as in *Goins*, the majority of the prosecutor's closing remarks were focused on a review of the evidence and the elements of the offenses charged. The prosecutor laid out the elements of first-degree murder and robbery with a firearm and indicated the State "must necessarily prove" them "beyond a reasonable doubt" in order for the jury to return guilty verdicts. The prosecutor reviewed the evidence in detail and argued the evidence tended to show the State had proved those elements. In all, the prosecutor's closing remarks were lengthy, and the improper argument amounted to two sentences towards the end of the State's closing.

The State concedes these remarks are highly improper and we caution the

prosecutor for wrongfully injecting this issue into the closing arguments. We observe these improper remarks made up only a small portion of the whole State's argument, and we conclude, as in *Goins,* the improper remarks were not a major focus of the State's argument to the jury.

The Supreme Court in *Goins* also examined the evidence presented to the jury. *Id.* at 479–80, 858 S.E.2d at 594. Between video footage, eyewitness testimony of the crime, and physical evidence, "virtually uncontested" evidence of the defendant's guilt was submitted to the jury. *Id.* at 480, 858 S.E.2d at 594.

Here, the State presented forensic evidence of internet searches conducted on Defendant's phone for "Walther PPS .40," and "2333 Floyd St." in the weeks prior to the day of Decedent's death. Cellphone records showed a conversation occurred on 1 September 2020 between Decedent and someone identified as "D"—the first letter of Defendant's name—about the sale of the Canik 9-millimeter handgun and an intention to meet.

Defendant's phone showed a search for "Canik 9" on the day the conversation took place, the same day of Decedent's death. Eyewitness testimony of an undercover officer placed Defendant at the scene of the shooting and inside of Decedent's vehicle. Thomas testified he and Defendant entered Decedent's vehicle; Decedent was sitting in the driver's seat and Defendant sat in the front passenger seat. The officer on-site heard the gunshot and witnessed Defendant and Thomas quickly return to their own vehicle and accelerate away from the parking lot.

The medical examiner testified Decedent died from a gunshot wound to the right side of his head, consistent with a shot fired from six to sixteen inches away from the passenger seat—where Defendant was seated. Within minutes of the shooting, officers apprehended Defendant and recovered counterfeit bills, ammunition, and four guns, including the .40 caliber Walther and Canik 9-millimeter handguns for which the Defendant's phone had conducted internet searches.

DNA analysis linked Defendant to Decedent's vehicle and the .40 caliber Walther handgun. A shell casing found from the front passenger seat of Decedent's car was confirmed to have been fired from the .40 caliber Walther recovered from Defendant. Defendant's pocket had contained a magazine containing .40 caliber ammunition.

Defendant's argument points to multiple weak points in the State's case against him: (1) arresting officers did not observe blood on Defendant; (2) the State could not conduct gunshot residue testing of Defendant's hands; (3) testing of the bullet found at the crime scene produced inconclusive results regarding which gun it was shot from; (4) Thomas told officers one other male had approached Decedent's vehicle and spoke of a gun before the gunshot occurred; (5) a third person's fingerprints were found on the front passenger-side door to Decedent's vehicle; (6) the shooting happened in a neighborhood where gunshots were common and potentially multiple individuals had disputes with Decedent. To counter these arguments, the State presented overwhelming evidence connecting Defendant to the gun transaction,

the scene of the shooting, the .40 caliber Walther murder weapon, and the DNA evidence.

The Court in *Goins* next examined the instructions given to the jury. *Id.* at 480, 858 S.E.2d at 594. The judge in *Goins* instructed the jury the defendant's decision to plead not guilty could not be taken as evidence of his guilt. *Id.* The judge also stated the defendant was presumed to be innocent; the State carried the burden to prove his guilt beyond a reasonable doubt. *Id.* Our Supreme Court determined the judge's instructions effectively cured any purported prejudice from any failure to intervene *ex meru motu*. *Id.* at 481, 858 S.E.2d at 595. Here, the trial court also instructed the jury on the presumption of innocence, the State's burden of proof beyond a reasonable doubt, and the fact a "not guilty" plea is not evidence of guilt.

The Court in *Goins* noted the jury's request to re-watch surveillance footage during deliberations "tend[ed] to show the jury based its decision on the evidence rather than on passion or prejudice resulting from the prosecutor's improper argument." *Id.* at 480, 858 S.E.2d 594. Here, also, the jury revisited evidence during deliberations, requesting to examine the magazine and ammunition from the .40 caliber Walther handgun, photographs, text messages, and video footage. This tends to show the jury was more focused on the evidence than on comments concerning Defendant's plea of "not guilty."

Based on our examination of the prosecutor's arguments, the evidence, and the instructions to the jury, we conclude Defendant has failed to show he was prejudiced

by the prosecutor's admittedly improper closing remarks. As the State properly concedes, the prosecutor's remarks were undeniably improper. Even so, we cannot conclude "the statements in context and in light of the overall factual circumstances to which they refer," were "so overreaching as to shift the focus of the jury from its fact-finding function to relying on its own personal prejudices or passions." *Huey*, 370 N.C. at 180, 804 S.E.2d at 470 (citation and quotation marks omitted); *State v. Duke*, 360 N.C. 110, 130, 623 S.E.2d 11, 24 (2005).

## VI. Conclusion

Defendant has failed to show he was prejudiced as a result of the prosecutor's improper closing remarks. The trial court did not prejudicially err by failing to intervene *ex metro motu* when the prosecutor purportedly urged the jury to punish Defendant for exercising his fundamental constitutional right to a jury trial. Defendant received a fair trial, free from prejudicial errors he preserved and argued. We discern no prejudicial error in the jury's verdict or in the judgment entered thereon. *It is so ordered.*

NO PREJUDICIAL ERROR.

Judge Wood concurs.

Judge Freeman concurs in result only.

Report per Rule 30(e).