STATE OF NORTH CAROLINA v. MAMIE LEE WARD

No. 88

(Filed 30 December 1974)

1. Jury § 7— jurors opposed to death penalty — challenge for cause proper

Defendant who was on trial for first degree murder was not denied a fair trial or due process or equal protection of the laws where the solicitor was allowed to challenge eighteen jurors for cause upon their statements on voir dire that they would not under any circumstances vote for a verdict requiring imposition of the death penalty.

2. Criminal Law § 112— reasonable doubt — definition proper

The trial court's definition of reasonable doubt which first stated ten things that are not sufficient to constitute a reasonable doubt did not confuse or mislead the jury where the court gave equal stress to the affirmative aspects of the definition.

3. Criminal Law § 130— notes taken by jury — no prejudice

Defendant was not prejudiced where three jurors took notes during the trial and carried them into the jury room for use during their deliberations.

4. Homicide § 30— intentional shooting — no involuntary manslaughter

The trial court in this first degree murder prosecution did not err in failing to instruct the jury on the lesser included offense of involuntary manslaughter where defendant, by her own statement, intentionally discharged a gun under circumstances naturally dangerous to human life.

5. Homicide § 30— shooting of boyfriend — no voluntary manslaughter

When one spouse kills the other in a heat of passion engendered by the discovery of the deceased and a paramour in the very act of intercourse, or under circumstances clearly indicating that the act has just been completed or is proximate, and the killing follows, it is manslaughter, but that rule does not apply when a defendant and deceased are not husband and wife; therefore, defendant, who shot

her boyfriend as he sat and talked with defendant's rival in his home, was not entitled to have the issue of her guilt of voluntary manslaughter submitted to the jury.

Chief Justice BOBBITT and Justices HIGGINS and SHARP dissenting as to death sentence.

APPEAL by defendant under G.S. 7A-27 (a) from *James, J.,* 17 September 1973 Criminal Session of EDGECOMBE, docketed and argued at the Spring Term 1974 as Case No. 30.

Defendant was tried and convicted of first degree murder upon an indictment, drawn under G.S. 15-144, which charged that on 19 July 1973 she "did kill and murder Frank Parker."

The State's evidence tends to show: About 8:00 p.m. on 19 July 1973 Frank Parker was seated in the den of his residence talking to Lucy Taylor, his girl friend of five months. Lucy had been there approximately thirty minutes when the phone rang. She answered it by saying, "Parker's residence." The person calling immediately hung up without speaking. Approximately ten minutes later, as she and Parker were talking, Lucy heard someone leave the front porch and walk around to the back door. She heard the back doorknob turn but did not hear anyone come inside. However, she told Parker he should see who was coming in. He got up, moved to a spot in the den from which he could see both the front and the back door, and reported he saw no one; that if "somebody was out there they had nothing to do but knock." He then sat back down and, at Lucy's request, dialed a telephone number for her.

Lucy had been talking on the phone a minute or two when the front door opened, and defendant appeared with "a shotgun lifted at an angle ready to fire." She fired the gun toward Frank Parker, who was "sitting relaxed on the couch." He was hit on the chin. As defendant broke the gun open and attempted to reload it, Lucy fled from the room and jumped out the back window. In her opinion, Parker had been fatally wounded. He said nothing before or after he was shot.

In response to a call, received about 8:15 p.m., William L. Melton, a police officer of the City of Rocky Mount, went to Parker's home. Upon entering the living room through the front door he observed a live shotgun shell on the floor in direct line with the door. To the left, towards the door into the den, he saw a spent shell on the floor. In the den he found a black male sitting on the couch, a large amount of blood about his person, and a

State v. Ward

hole to the right of the center of his face about his mouth. In Melton's opinion the man was dead at the time. There was no living person in the house at the time Melton arrived. In the middle bedroom he saw three rifles or shotguns over in the corner.

At 8:25 p.m., S. F. Watson, detective sergeant of the Rocky Mount Police Department, interviewed defendant at the police station. After she had been fully advised of all her constitutional rights, and had signed the standard waiver of rights, she told the officers that she had shot Frank Parker at his house. In answer to Watson's questions she made the statement summarized below.

Defendant and Frank had been having trouble a little over a month. She walked over to Frank's house, went to the rear door, and entered through the kitchen. Frank saw her and motioned her into the rear bedroom, adjacent to the kitchen. From there she went into the adjoining bedroom where Frank kept his guns. She got a gun from a rack on the wall and then walked through the bedrooms into the living room. There she aimed the gun at Frank Parker and shot it. She then left the house through the front door, called a cab from a friend's house and came to the police station.

After she had made the foregoing statement she told the officers that she was upset and would like time to think before answering any more questions. The interrogation ended, and Watson accompanied Detective Mullen to Parker's home, where they joined Officer Melton. They entered the living room and found a single-barrel shotgun in the corner just right of the door. The gun smelled of fresh gun powder and was about three feet from the spent shell on the living room floor.

The following morning Dr. F. W. Avery, a pathologist, performed an autopsy on Parker's body. He testified that Parker's death resulted from a hemorrhage secondary to a gunshot wound in the face.

Defendant offered evidence which tended to show: For approximately two and a half years prior to May 1973, defendant and Frank Parker had lived together at 320 Olive Street. Defendant kept her personal possessions at Parker's house, shared living expenses with him, and cooked his meals. During this period they had taken a vacation bus tour to Canada, and on Labor Day 1972 they had attended a family reunion of de-

State v. Ward

fendant's relatives in Hampton, Virginia. In May 1973 defendant's daughter, Brenda Ward, returned to Rocky Mount from New Jersey with a baby, and defendant moved into an apartment at 520 Gay Street with her.

William R. Gaynor, a cab driver, testified that sometime after 6:00 p.m. on 19 July 1973 he picked up defendant at the corner of Middle and Gay Streets and took her to 320 Olive Street. At that time she appeared normal to him and had no gun as far as he could see. He thought he was taking her home. He had "picked her up and taken her there before."

Defendant's testimony, summarized except when quoted, tends to show: She is 52 years old and, on 19 July 1973, was employed as a cook at the Carolina Cafe. She has been separated from her husband for 19 years. Her three children were grown. She had known Frank Parker about twenty years, and they had lived together for three. They broke up housekeeping on 19 July 1973 because her daughter returned to Rocky Mount with a baby, and she decided that it was best for her to be with them. When she and Frank discussed the move he said to her, "Well, it won't be no difference between us, baby. You come to see me and I can go see you. You will still be home." Until her daughter came home defendant slept every night at 320 Olive Street, but thereafter she "went backwards and forwards." She "would go over there and spend the night and sometimes . . . stay half the night." She saw Frank just about every day; he was her "boy-friend." When he got off work at 6:00 he would stop by to see her. On the afternoon of July 18th he had stopped by and asked her to come to his house. The next day, about 8:00 p.m. (traveling in a cab), she went to Frank's house just like any other night. As usual she went in the back door without knocking and entered the kitchen. She heard Lucy talking on the telephone and heard her stop to tell Frank that somebody was walking in his house. Frank came into the kitchen and, without a word, waved defendant into the back bedroom.

In material part, defendant's account of subsequent events is as follows: "I went in the back bedroom and I sat there on the bed and then I jumped right up and I run and grabbed the gun and went right in the room. I went through the bedrooms and in the living room. And that's when I fired. But I didn't want to kill him. It was so fast and I got upset. I don't really know exactly what happened. I saw Lucy. She and Frank were sitting on the couch. . . . When Frank come in there and waved

for me to go in the back bedroom, I got upset and I couldn't think. It was two guns on the rack and I just reached right up and got it. . . . I don't know where I got the shells. I don't remember even loading the gun. . . . This was a man I loved. A man I did not want to hurt. . . . I really don't know what I was intending to do when I reached up and got the shotgun. I can't express what I was thinking. I was not intending to shoot him. . . . I saw him fall back after I had fired the shotgun. I just walked out the door. I called a cab and went to the police station. . . . I went to the police station to give up. I told them that I had shot him."

Defendant testified that she had previously met Lucy Taylor; that she had seen her at Frank's house three times. She had come when defendant was there. Defendant and Frank had "talked about Lucy because she called a lot."

The court instructed the jury to return one of three verdicts: Guilty of murder in the first degree, guilty of murder in the second degree, or not guilty. The verdict was "Guilty of murder in the first degree." The court imposed the sentence of death and defendant appealed.

*Robert Morgan, Attorney General and John R. B. Matthis, Assistant Attorney General, for the State.*

*Chambers, Stein, Ferguson & Lanning and Howard A. Knox, Jr., for defendant appellant.*

MOORE, Justice.

[1] The record discloses that in the selection of the jury "the solicitor was allowed to challenge for cause 18 prospective jurors after said 18 jurors stated on voir dire that he or she would not under any circumstances, regardless of the evidence, consider joining in a verdict the result of which the death penalty would be imposed, but would automatically vote against such a verdict regardless of the evidence and would not even consider such a verdict in his or her deliberation of the case." Defendant's first assignment of error is that the exercise of these 18 challenges by the State denied her (1) the fair trial by an impartial jury guaranteed by U. S. Const. Amend. VI, and (2) due process and the equal protection of the laws guaranteed by U. S. Const. Amend. XIV.

The foregoing contentions have been repeatedly overruled by this Court and so recently discussed that it would serve no

useful purpose to re-examine them here. *State v. Honeycutt,* 285 N.C. 174, 203 S.E. 2d 844 (1974) ; *State v. Fowler,* 285 N.C. 90, 203 S.E. 2d 803 (1974) ; *State v. Crowder,* 285 N.C. 42, 203 S.E. 2d 38 (1974). *See Witherspoon v. Illinois,* 391 U.S. 510, 20 L.Ed. 2d 776, 88 S.Ct. 1770 (1968).

With reference to the voir dire examination of the eighteen jurors whom the State challenged for cause, defendant makes the novel argument that when prospective jurors are told the crime for which the defendant is being tried carries a mandatory death penalty, they are given information which is irrelevant to the jury's function, "thereby confusing it as to its proper role." It is inconceivable to us that a jury could try a capital case without finding out it was doing so. Certainly, any effort to keep this information from the jury could only result in confusion and resentment. A defendant, charged with a capital crime and convicted by a jury which did not know the death penalty was involved, would surely contend that he had been prejudiced by its ignorance. Jurors trying a capital case can reasonably be counted on to weigh the evidence with the greatest care and to require proof of the defendant's guilt beyond a reasonable doubt, and assumedly counsel for defendant can be counted on to point out to the jury the consequences of their failure to do so. *See State v. Britt,* 285 N.C. 256, 204 S.E. 2d 817 (1974) ; *State v. Carey,* 285 N.C. 509, 206 S.E. 2d 222 (1974).

Defendant's assignment of error No. 1 is overruled.

[2] Defendant's third assignment of error is to that portion of the judge's charge in which he defined reasonable doubt as follows:

"You have heard during the trial of this case the term 'reasonable doubt' used many times, so the question arises, what kind of a doubt is a reasonable doubt? You must have some understanding and knowledge of what reasonable doubt is before you can properly perform your duty as jurors in this case. And so I instruct you that a reasonable doubt is not just any kind of doubt, it is not just a possible, imaginary or fanciful doubt; it is not a doubt which might be prompted or suggested to your mind by sympathy for the defendant or her people or family; it is not a doubt which might be born of a merciful inclination or disposition on your part to permit the defendant to escape the penalty of the law; it is not a doubt which originates

State v. Ward

in your mind by some ingenious or illogical twist or misconstruction of the evidence. Your mind and judgment should tell you that a doubt would not be reasonable if it was founded upon or suggested by any of these considerations. On the contrary, a reasonable doubt is a sane, sensible, honest doubt based upon reason and common sense. It is an actual, honest and substantial misgiving or doubt of guilt or question of guilt which reasonably arises from the evidence or from the lack of evidence or the insufficiency of the evidence, and a reasonable doubt exists and exists only when the evidence or proof honestly fails to convince or satisfy your judgment and reason to a moral certainty of the guilt of the accused. Thus, if the evidence or proof is such that after due consideration of all the evidence you are fully convinced and entirely satisfied, not to an absolute certainty but to a moral certainty, of the truth of the charge, then you would be satisfied beyond a reasonable doubt and it would be your duty to return a verdict of guilty. On the other hand, if after weighing and considering all of the evidence, you have an actual, honest, substantial misgiving or question as to guilt, a sane, rational doubt based on reason and common sense, then you would have a reasonable doubt, and it would be your duty to give the defendant the benefit of that doubt and to return a verdict of not guilty."

Defendant contends that by first stating "that a reasonable doubt is *not* ten different things" the court overemphasized its negative aspects and left the jury with the impression "that a reasonable doubt is a rare thing indeed, if it ever exists at all." Conceding *arguendo* that the judge overdefined reasonable doubt, it appears nevertheless that he did give equal stress to the affirmative aspects of the definition. We cannot believe that the jury was misled or confused. Notwithstanding, we repeat what this Court has said a number of times, "The words 'reasonable doubt' in themselves are about as near self-explanatory as any explanation that can be made of them." *State v. Wilcox*, 132 N.C. 1120, 1137, 44 S.E. 625, 631 (1903) ; *State v. Phillip*, 261 N.C. 263, 269, 134 S.E. 2d 386, 391 (1964). In any event we again recommend to the trial judge the shorter, approved definitions, appearing in numerous decisions of this Court. *See State v. Hammonds*, 241 N.C. 226, 85 S.E. 2d 133 (1954). Defendant's third assignment of error is overruled.

[3] Defendant's assignment of error No. 7 is that the court erred in denying her motion to set aside the verdict because

State v. Ward

three jurors had taken notes into the jury room for use during their deliberations. When this motion was made the judge immediately and carefully examined the jury. His examination revealed that two jurors had noted the names of the witnesses who had testified and had made some notes during the charge. A third juror had noted the court's definitions of first and second degree murder. Counsel for defendant, who said they had been unaware of the note-taking, argued that it raised such serious questions "concerning the integrity of the jury's process of deliberation" as to invalidate the verdict. We find nothing in the record which supports this contention.

Since defense counsel were unaware that the three jurors were taking notes, it is not to be assumed that their writing distracted the attention of the other jurors from the testimony. As defendant states in her brief, "The trial was both short and simple"; so it is quite unlikely that the three jurors' notes gave them a position of undue influence in the jury's deliberations. As Chief Justice Parker said in *State v. Shedd*, 274 N.C. 95, 104, 161 S.E. 2d 477, 484 (1968), "Most authorities in this Nation take the view that the making and use of trial notes by the jury is not misconduct but is proper, and may even be desirable, where it is unattended by undue consumption of time. *S. v. Goldberg*, 261 N.C. 181, 134 S.E. 2d 334, cert. den. 377 U.S. 978, 12 L.Ed. 2d 747; *Cowles v. Hayes*, 71 N.C. 230; Annot. in 14 A.L.R. 3d 831 *et seq.* entitled 'Taking and Use of Trial Notes by Jury'; 89 C.J.S., Trial, § 456; 23A C.J.S., Criminal Law, § 1367. . . . " *See* 75 Am. Jur. 2d, *Trial* § 934 (1974). Assignment of error No. 7 is overruled.

Defendant stresses most strenuously her assignment of error No. 6, that the court erred by failing to instruct the jury on the lesser offenses of voluntary and involuntary manslaughter. "The necessity for instructing the jury as to an included crime of lesser degree than that charged arises when and only when there is evidence from which the jury could find that such included crime of lesser degree was committed. The *presence of such evidence* is the determinative factor." *State v. Hicks*, 241 N.C. 156, 159, 84 S.E. 2d 545, 547 (1954). This assignment, therefore, presents the question whether the record contains any evidence which would support a verdict of either involuntary or voluntary manslaughter.

[4] Involuntary manslaughter is the unintentional killing of a human being without either express or implied malice (1) by

some unlawful act not amounting to a felony or naturally dangerous to human life, or (2) by an act or omission constituting culpable negligence. *State v. Foust*, 258 N.C. 453, 128 S.E. 2d 889 (1963). *See State v. Wrenn*, 279 N.C. 676, 185 S.E. 2d 129 (1971). Clearly the evidence did not justify a charge on involuntary manslaughter. Defendant makes no contention that the gun was discharged accidentally. On the contrary she testified, "I went in the back bedroom and I sat there on the bed and then I jumped right up and I run and grabbed the gun and went right in the room. I went through the bedrooms and in the living room. *And that's when I fired.* But I didn't want to kill him. . . . " (Emphasis added.) By her own statement defendant intentionally discharged the gun under circumstances naturally dangerous to human life.

[5] It is equally clear that the evidence will not support a verdict of voluntary manslaughter. The killing did not result from the use of excessive force in the exercise of the right of self-defense; nor was it the result of anger suddenly aroused by provocation which the law deems adequate to dethrone reason temporarily and to displace malice. *See State v. Woods*, 278 N.C. 210, 179 S.E. 2d 358 (1971) ; *State v. Merrick*, 171 N.C. 788, 88 S.E. 501 (1916) ; *State v. Baldwin*, 152 N.C. 822, 68 S.E. 148 (1910). *See also State v. Wrenn, supra* at 687, 185 S.E. 2d at 136.

The following circumstances aroused the passion upon which defendant relies to reduce the homicide from murder to manslaughter: She found her boyfriend of three years entertaining her rival in the den of his home on an evening when he had invited defendant to visit him. Then, in order to avoid a confrontation between the two women, he had silently waved defendant into a back bedroom and then resumed his conversation with Lucy as if defendant were not in the house.

Defendant and deceased were not husband and wife. However, even had they been lawfully married to each other, his conduct would not, in law, have constituted adequate cause for passion which would mitigate the killing to manslaughter. Defendant did not find Parker and Lucy in the act of adultery. On the contrary, both were fully clothed, sitting on the sofa in the den, and Lucy had been talking on the phone at the time defendant entered the house.

When one spouse kills the other in a heat of passion engendered by the discovery of the deceased and a paramour in

State v. Ward

the very act of intercourse, or under circumstances clearly indicating that the act had just been completed, or was "severely proximate," and the killing follows immediately, it is manslaughter. However, a mere suspicion, belief, or knowledge of past adultery between the two will not change the character of the homicide from murder to manslaughter. The law extends its indulgence to a transport of passion justly excited and to acts done before reason has time to subdue it; the law does not indulge revenge or malice, no matter how great the injury or grave the insult which first gave it origin. *State v. John,* 30 N.C. 330 (1848) ; *State v. Samuel,* 48 N.C. 74 (1855) ; *State v. Avery,* 64 N.C. 608 (1870) ; *State v. Harman,* 78 N.C. 515 (1878). *See State v. Holdsclaw,* 180 N.C. 731, 105 S.E. 181 (1920) ; 40 C.J.S., *Homicide* § 49 (1944) ; 40 Am. Jur. 2d, *Homicide* § 65 (1968).

Defendant argues that where a relationship comparable to that of husband and wife has been of long standing "the rule of mitigation should extend beyond the marital relation" and that "this case comes squarely within the modern view of adequate provocation." In our view the words of Justice English in *People v. McDonald,* 63 Ill. App. 2d 475, 480, 212 N.E. 2d 299, 302 (1965), are appropriate here: "In the first place we do not think that the facts in evidence disclose the 'compromising situation' which defendant uses as the base for his argument. Beyond that, however, we are aware of no case which applies the exculpatory features of *crime passionel* to the killing of a mistress, regardless of the duration of the relationship. We will not do so in this case." *See Cyrus v. State,* 102 Ga. 616, 29 S.E. 917 (1897) ; 40 C.J.S., *Homicide* § 49. Defendant's assignment of error No. 6 is overruled.

Defendant's assignment of error No. 8, that the death penalty constitutes cruel and unusual punishment a violation of U. S. Const. amends. VIII and XIV, has heretofore been decided adversely to defendant's contentions. *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974) ; *State v. Barber,* 278 N.C. 268, 179 S.E. 2d 404 (1971) ; *State v. Atkinson,* 278 N.C. 168, 179 S.E. 2d 410 (1971).

Defendant brought forward nine assignments of error. All have been most carefully considered; none discloses prejudicial error.

No error.

Chief Justice Bobbitt, Justice Higgins, and Justice Sharp dissent as to the death sentence and vote to remand for imposition of a sentence of life imprisonment for the reasons stated in the dissenting opinion of Chief Justice Bobbitt in *State v. Jarrette*, 284 N.C. 625, 666, 202 S.E. 2d 721, 747 (1974), the homicide involved herein having been committed in July 1973, that is, in the period between 18 January 1973, the date *State v. Waddell*, 282 N.C. 431, 194 S.E. 2d 19, was decided, and 8 April 1974, the date N. C. Sess. Laws, Ch. 1201 (1973), which rewrote G.S. 14-21, became effective.