STATE OF NORTH CAROLINA v. DIMITRY SIMONOVICH

No. COA09-585

(Filed 19 January 2010)

**1. Homicide— requested instruction—voluntary manslaughter—failure to show heat of passion or provocation**

The trial court did not err by denying defendant's request for a jury instruction on voluntary manslaughter because there was no evidence that defendant was driven to strangle his wife by a legally recognized heat of passion or provocation even though defendant testified he was aware of his wife's past relationships with other men and her stated intent to continue that behavior.

**2. Sentencing— requested instruction—aggravating factor—failure to submit proposed instruction in writing**

The trial court did not err during the sentencing phase of a trial by denying defendant's request to provide a jury instruction

concerning the definition of an aggravating factor because defendant did not submit a proposed instruction in writing to the trial court as required by N.C.G.S. § 15A-1231(a).

### 3. Sentencing— mitigating factors—strong provocation—extenuating relationship

The trial court did not abuse its discretion by failing to find certain mitigating factors under N.C.G.S. § 15A-1340.16(e)(8) that defendant acted under strong provocation or that the relationship between the parties was extenuating based on the evidence of the wife's alleged infidelity because there was no evidence which would morally shift part of the fault for the crime to the victim.

Appeal by Defendant from judgment entered 7 August 2008 by Judge James U. Downs in Superior Court, Buncombe County. Heard in the Court of Appeals 27 October 2009.

*Attorney General Roy Cooper, by Special Deputy Attorney General Richard L. Harrison, for the State.*

*M. Alexander Charns for Defendant-Appellant.*

McGEE, Judge.

Dimitry Simonovich (Defendant) was convicted on 7 August 2008 of second-degree murder of his wife, Inna Simonovich (Inna). The trial court sentenced Defendant to an active term of 196 months to 245 months. Defendant appeals.

The evidence at trial tended to show that Defendant and Inna were natives of Belarus and were married to each other in Belarus on 8 August 2003. Inna emigrated to the United States with her parents less than three months later, while Defendant remained in Belarus. Defendant and Inna communicated regularly by telephone and Inna provided clothing and other material support to Defendant. Defendant's relationship with Inna began to deteriorate. They argued and Inna told Defendant she no longer loved him. They contemplated divorce, but Defendant remained hopeful and continued to work toward reuniting with Inna in the United States.

Defendant came to the United States on 1 March 2007 and began to teach himself English. At the time of trial, he could not speak English. Defendant and Inna shared an apartment in Asheville, which was located in the same apartment complex as Inna's family. At trial, Defendant testified through an interpreter that he found a job in-

stalling marble and granite countertops. Inna's mother testified through an interpreter that Inna worked as a cleaner at various locations around Asheville. During April of 2007, Inna became pregnant with Defendant's child. Defendant testified that he had been praying for Inna to become pregnant and that, when she told him about the pregnancy, he "was very excited."

Defendant further testified to the following at trial. Inna told Defendant that, while Defendant was still living in Belarus, she had sexual relationships with several men in the United States. On the evening Defendant arrived in the United States, Inna said to him: "Please forgive me. I have cheated on you." Defendant told Inna to "[f]orget everything that was before me—that happened before me. I came here; now let's start a new life together." Inna told Defendant about her relationships with other men and she continued to receive telephone calls from a man Defendant identified as Inna's "boyfriend." Defendant testified that Inna kept pornographic materials in their apartment and used a computer to view pornographic web sites and Russian dating web sites. Defendant wanted Inna to stop seeing other men and had several arguments with Inna about that.

Inna's mother and sister testified at trial through interpreters. Inna's mother testified that she did not know what Inna used the computer for. Inna's sister, Larisa, testified that she was not aware of Inna having any relationships outside of her marriage to Defendant nor was she aware of Inna's use of the internet for pornographic or dating purposes. Larisa also testified that she did not hear Inna tell Defendant that Inna had sex with other men.

Defendant testified that at times the arguments were heated and physically threatening to Inna. During one argument, Defendant took Inna's telephone, intending to erase her boyfriend's telephone number from the telephone's memory, but became angry and broke the telephone instead. During another argument, Defendant broke Inna's discs containing pornographic materials and threw a pornographic magazine at her.

Defendant described another incident during which Inna took Defendant's passport and locked herself in the bedroom. Defendant kicked open the bedroom door and Inna called out for her sister, who was a neighbor, to help. Inna refused to return Defendant's passport, and Defendant "grabbed her by the neck." Defendant and Inna struggled until Inna reached for a pair of scissors and Defendant then

released her. Defendant again grabbed Inna and she bit him. Inna ran to her sister's apartment and Defendant went to sleep.

Defendant testified that he and Inna fought again on 27 July 2007. Defendant wanted to have sex with Inna, but she was not interested. Inna told Defendant that she did not love him and that they could no longer live together. Inna also told Defendant that "[i]f [she] wanted to have sex [she] could find [herself] another man." When Defendant told her that he did not want her to find another man, Defendant said Inna replied, "I will do it just to make you angry. I will go with some-one else or I will make a phone call and they will come and get me." Defendant took Inna's telephone and car keys and left the apartment for the night. Defendant worked all the next day.

Defendant testified that when he returned home from work the next day, Inna was not there. She returned later with her mother and demanded that Defendant return her keys. Defendant and Inna ar-gued and Inna again threatened to leave. After some time, Defendant asked Inna to forgive him and she replied, "[n]ever." Defendant and Inna continued to argue, and at one point, Defendant testified he said: "If you don't want to stay with me, then give me half of the money and I will pack up my things and I will leave." Defendant testified Inna said they had no money to divide because she had taken their $5,000 savings and had rented and furnished a new apartment. Defendant testified that he "got really mad at her for this."

The argument escalated and Inna began making threats to "go with another man." Defendant replied "[i]f you . . . do this, then I would probably choke you." Defendant testified that he "wanted to gather my clothes and go, maybe get in the car and go to sleep just like [the night before], but [he] thought 'tomorrow is the church services,' so [he] didn't want to go anywhere." Defendant remained in the apartment and the argument continued. Inna began to threaten to inflict bruises on herself, go to the courthouse where she worked, and have Defendant put in jail as an abusive spouse. Defendant testified he eventually said, "Inna, do not annoy me because you don't even realize how angry you're making me." Inna responded, "[w]ell, I am going to create [sic] this for you."

Defendant testified that he grabbed Inna at her throat because he wanted "to close her mouth, to keep her quiet[.]" Defendant "did not know what [he] was doing at that moment[,]" but he testified that he put his hands on Inna's throat because he "simply wanted her to shut up, not to aggravate [him], not to make [him] mad." Defendant held

onto Inna's throat until she began to slide off the bed. Defendant then noticed that Inna's face was bloody and she was not breathing. Defendant could not feel Inna's pulse. He got dressed and drove toward the courthouse looking for a police officer.

Defendant found an officer, made gestures indicating strangulation, and said "my wife." Defendant showed the officer his identification with his address on it and the officer began to understand what Defendant was trying to tell him. Defendant presented his hands to the officer and the officer placed him in handcuffs.

Defendant was charged with first-degree murder and was tried on 28 July 2008. A jury found Defendant guilty of second-degree murder. The jury further found that Defendant "knew at the time he committed the offense (2nd Degree Murder) that the victim was pregnant and that the foregoing was an aggravating factor."

### Voluntary Manslaughter

[1] Defendant first argues that the trial court erred by denying Defendant's request for a voluntary manslaughter jury instruction. We disagree.

"First-degree murder is the unlawful killing—with malice, premeditation and deliberation—of another human being." *State v. Arrington*, 336 N.C. 592, 594, 444 S.E.2d 418, 419 (1994) (citations omitted). "Voluntary manslaughter is the killing of another human being without malice and without premeditation and deliberation under [1] the influence of some passion or [2] heat of blood produced by adequate provocation." *State v. Watson*, 338 N.C. 168, 176, 449 S.E.2d 694, 699 (1994), *cert. denied*, 514 U.S. 1071, 131 L. Ed. 2d 569, *overruled on other grounds by State v. Richardson*, 341 N.C. 585, 461 S.E.2d 724 (1995).

Voluntary manslaughter is a lesser included offense of first-degree murder. *State v. Woodard*, 324 N.C. 227, 232, 376 S.E.2d 753, 756 (1989). "A jury must be instructed on a lesser included offense only when evidence has been introduced from which the jury could properly find that the defendant had committed the lesser included offense." *Woodard*, 324 N.C. at 232, 376 S.E.2d at 756 (citations omitted). "In order to receive an instruction on voluntary manslaughter, there must be evidence tending to show '[a] killing [was] committed in the heat of passion suddenly aroused by adequate provocation, or in the imperfect exercise of the right of self-defense [.]' " *State v. Vincent*, —— N.C. App. ——, ——, 673 S.E.2d 874, 876 (2009) (quoting *State v. Huggins*, 338 N.C. 494, 497, 450 S.E.2d 479, 481 (1994)).

**STATE v. SIMONOVICH**

[202 N.C. App. 49 (2010)]

Defendant does not argue that he acted "in the imperfect exercise of the right of self defense," *Id.*, but rather that Inna's "sexual taunting was tantamount to her being in bed with another man[,]" and that, as a result of this taunting, Defendant "snapped and grabbed his wife around the neck." Defendant requests us to consider these facts as sufficient to warrant a jury instruction on voluntary manslaughter. Specifically, Defendant argues the following factors support such an interpretation of the events:

[(1)] [Inna] and [Defendant] were married when the adultery took place.

[(2)] They were married when the threat to commit adultery again was made.

[(3)] The passion suddenly aroused in [Defendant] was when the deceased told him—while they were in the marital bed—that she was going to have sex with other men (as she had done on other occasions during the marriage, and then told him about).

[(4)] She was leaving him, she didn't love him and she had spent all of their savings.

[(5)] The past adultery provided the basis for believing the threat to commit adultery.

Our Supreme Court has held that it is not sufficient to simply show that a defendant acted in a heat of passion. There must also be a showing that "[s]uch sudden heat of passion [arose] upon what the law recognizes as adequate provocation." *Woodard*, 324 N.C. at 232, 376 S.E.2d at 756 (citing *State v. Ward*, 286 N.C. 304, 210 S.E.2d 407 (1974) *death penalty vacated mem.*, 428 U.S. 903, 49 L. Ed. 2d 1207 (1976)). Provocation which will justify an instruction on manslaughter " 'must be more than mere words; as language, however abusive, neither excuses nor mitigates the killing[.]' " *State v. Watson*, 287 N.C. 147, 154, 214 S.E.2d 85, 90 (1975) (citations omitted).

Our Supreme Court held in *Ward*:

When one spouse kills the other in a heat of passion engendered by the discovery of the deceased and a paramour in the very act of intercourse, or under circumstances clearly indicating that the act had just been completed, or was "severely proximate," and the killing follows immediately, it is manslaughter. However, a mere suspicion, belief, or knowledge of past adultery between

STATE v. SIMONOVICH

[202 N.C. App. 49 (2010)]

the two will not change the character of the homicide from murder to manslaughter. The law extends its indulgence to a transport of passion justly excited and to acts done before reason has time to subdue it; the law does not indulge revenge or malice, no matter how great the injury or grave the insult which first gave it origin.

*Ward,* 286 N.C. at 312-13, 210 S.E.2d at 413-14 (internal citations omitted).

In the case before us, Defendant and Inna were in bed when they began arguing. Defendant testified he was aware of Inna's past relationships with other men and her stated intent to continue that behavior. There was no evidence that Defendant had found Inna "in the very act of intercourse, or under circumstances clearly indicating that the act had just been completed, or was 'severely proximate[.]' " *Id.* There was, therefore, no evidence that Defendant was driven to strangle Inna by a legally recognized heat of passion. To the contrary, Defendant himself testified that he put his hands on Inna's throat because he "simply wanted her to shut up, not to aggravate [him], not to make [him] mad."

Although Defendant acknowledges that he did not find Inna "in the very act of intercourse, or under circumstances clearly indicating that the act had just been completed, or was 'severely proximate,' " *Id.*, he "requests that [this Court] extend existing case law to consider the evidence of on-going adulterous behavior of a spouse, along with the promise to continue the adulterous intercourse, to be adequate provocation and sufficiently proximate to warrant a voluntary manslaughter instruction." Our Supreme Court has developed longstanding case law governing the range of legally adequate provocations for voluntary manslaughter. *See Id.* Defendant's conduct is clearly not within that range and our Court cannot extend existing case law in the manner requested by Defendant. Because there was no evidence that Defendant was driven to kill Inna by a legally recognized adequate provocation, we find no error in the trial court's refusal to instruct the jury on voluntary manslaughter.

*Jury Instructions*

[2] Defendant next assigns error to the trial court's denial of Defendant's request to provide a jury instruction concerning the definition of an "aggravating factor." We disagree.

STATE v. SIMONOVICH

[202 N.C. App. 49 (2010)]

During the sentencing phase of Defendant's trial, the trial court submitted a verdict sheet to the jury, with the following question:

Do you find from the evidence presented, beyond a reasonable doubt, the following factor:

That the Defendant knew at the time he committed the offense (2nd Degree Murder) the victim was pregnant and that the foregoing was an aggravating factor?

___ Yes.

___ No[.]

Prior to the trial court's instructing the jury, Defendant and the trial court had the following exchange:

[Defendant's Counsel]: Would you define for them an aggravating factor?

[Judge]: Sir?

[Defendant's Counsel]: Isn't there a definition in the statute of an aggravating factor?

[Judge]: I don't know.

However, Defendant submitted no special instruction to the trial court in writing at that time. The trial court instructed the jury in pertinent part as follows:

[D]efendant has denied not so much the existence of the factor— but you can consider that he has—but has denied the fact that it was aggravating. The fact that the State has alleged such factor exists is no evidence that it does, in fact, exist or that it is aggravating. Under our system of justice, when a defendant denies the existence of an aggravating factor and/or whether it is aggravating, he's not required to prove that it does not exist or that it is not aggravating. It is presumed that it does not exist and it is presumed that it is not aggravating. The State must prove to you beyond a reasonable doubt that such factor—aggravating factor exists.

Defendant renewed his objection to the trial court's instruction on "aggravating factor."

Defendant argues that the trial court's failure to define "aggravating factor" "implicitly asked [the jury] to make a decision based on no

more than their personal feelings and opinions about Inna's 15-week-old pregnancy." Defendant further argues that, because "the abortion issue" is "politically charged," a juror's opinion about it "could well color a juror's consideration of the non-statutory aggravating factor that the deceased had been pregnant."

"At the close of the evidence or at an earlier time directed by the judge, any party may tender written instructions." N.C. Gen. Stat. § 15A-1231(a) (2009). Our Supreme Court has recognized that, "such requested special instructions 'should be submitted in writing to the trial judge at or before the jury instruction conference.'" *State v. Augustine*, 359 N.C. 709, 729, 616 S.E.2d 515, 530 (2005) (internal citations omitted). The Supreme Court has also held that "a trial court did not err where it declined to give requested instructions that had not been submitted in writing." *Id.* (citations omitted).

In the case before us, Defendant requested that the trial court instruct the jury as to the definition of "aggravating factor." When asked for clarification, Defendant responded by asking the trial court: "Isn't there a definition in the statute of an aggravating factor?" The trial court did not know whether there was such a definition. Defendant did not submit a proposed instruction in writing to the trial court. Defendant submitted to this Court an addendum to the record on appeal containing a document titled "Jury Instructions Not Given[,]" which purports to define "aggravating factor." We note, however, that this instruction was not submitted to the trial court, in writing or otherwise. Because Defendant failed to submit a requested instruction in writing to the trial court, we hold that the trial court did not err by declining to instruct the jury as to a definition of "aggravating factor."

## Mitigating Factors

[3] Defendant next argues that the trial court erred by failing to find certain mitigating factors. Specifically, Defendant contends that the trial court should have found as mitigating the following factor: that Defendant acted under strong provocation or that the relationship between Defendant and Inna was extenuating because of the uncontradicted evidence of Inna's infidelity.

N.C. Gen. Stat. § 15A-1340.16(a) states that a trial court "shall consider evidence of aggravating or mitigating factors present in the offense that make an aggravated or mitigated sentence appropriate, but the decision to depart from the presumptive range is in the discretion of the court." N.C.G.S. § 15A-1340.16(a) (2009). The trial court

is required to consider the mitigating factors set forth in N.C.G.S. § 15A-1340.16(e) and to make written findings of fact concerning these factors. *See State v. Johnson*, —— N.C. App. ——, ——, 674 S.E.2d 727, 731, *appeal dismissed* 363 N.C. 378, 679 S.E.2d 395 (2009). " 'A sentencing judge must find a statutory mitigating sentence factor if it is supported by a preponderance of the evidence. A mitigating factor is proven when the evidence is substantial, uncontradicted, and there is no reason to doubt its credibility.' " *Id.* (quoting *State v. Kemp*, 153 N.C. App. 231, 241, 569 S.E.2d 717, 723, *disc. rev. denied* 356 N.C. 441, 573 S.E.2d 158 (2002)). "A trial judge is given 'wide latitude in determining the existence of . . . mitigating factors,' and the trial court's failure to find a mitigating factor is error only when 'no other reasonable inferences can be drawn from the evidence.' " *State v. Norman*, 151 N.C. App. 100, 105-06, 564 S.E.2d 630, 634 (2002) (internal citations omitted).

Defendant argues the mitigating factor set forth in N.C.G.S. § 15A-1340.16(e)(8) that "[t]he defendant acted under strong provocation, or the relationship between the defendant and the victim was otherwise extenuating" applies to the facts before us, and that the trial court erred by failing to find this mitigating factor. N.C. Gen. Stat. § 15A-1340.16(e)(2007). Defendant relies on *State v. Mixion*, 110 N.C. App. 138, 429 S.E.2d 363, *disc. review denied*, 334 N.C. 437, 433 S.E.2d 183 (1993), to support his contention that he acted under strong provocation or that his relationship with Inna was otherwise extenuating. Our Court noted in *Mixion* that, though N.C.G.S. § 15A-1340.16(e)(8) is listed as one factor, each component must be analyzed separately. *Id.* at 152, 429 S.E.2d at 371. We begin with a determination of whether "the relationship between . . . [D]efendant and [Inna] was otherwise extenuating." N.C.G.S. § 1340.16(e)(8).

In *Mixion*, we held that a trial court did not err in failing to find an extenuating relationship on the following facts. The victim and the defendant's sister-in-law entered their house and found the victim's husband, the defendant. *Mixion*, 110 N.C. App. at 142, 429 S.E.2d at 365. The victim was angry with the defendant and shouted at him. *Id.* The victim then drew a pistol and brandished it at the defendant. *Id.* A struggle ensued and the defendant eventually shot the victim, killing her. *Id.* The defendant claimed that the marriage was " 'mutually stormy and difficult.' " *Mixion*, 110 N.C. App. at 151, 429 S.E.2d at 371. The son of the defendant and the victim testified that each parent was at fault. *Id.* The wrongs to the defendant done by the victim included that she: "[(1)] apparently shot a gun at [the] defendant dur-

ing their marriage[;] [(2)] falsely accused [the] defendant of having venereal disease[;] and [(3)] threatened to shoot [the] defendant [twice.]" *Id.*

In *Mixion*, we noted:

An extenuating relationship should be found if circumstances show that part of the fault for a crime can be "morally shifted" from defendant to the victim.

. . .

Past difficulties in a marital relationship are not sufficient to support a finding of an extenuating relationship. In *State v. Bullard*, 79 N.C. App. 440, 339 S.E.2d 664 (1986), the Court stated that although the defendant and victim had been arguing over an extended period of time, this evidence did not compel a finding that they had an extenuating relationship, because this evidence did not "necessarily lessen the seriousness of the crime committed."

*Id.* at 151-52, 429 S.E.2d at 371 (internal citations omitted). So noting, we held that "we cannot conclusively determine that this mitigating factor exists." *Id.* at 152, 429 S.E.2d at 371.

Here, Defendant contends that Inna's "sexual infidelity and betrayal" were "far worse than just 'past difficulties[.]' " We disagree. The evidence at trial suggested that, at most, Inna repeatedly had extra-marital sexual relationships and that the couple repeatedly fought about that behavior. In light of the facts of Mixion, we are not persuaded that any of Inna's actions "necessarily lessen the seriousness of the crime committed." *Mixion*, 110 N.C. App. at 152, 429 S.E.2d at 371 (internal citations omitted). We therefore hold that the trial court did not err by failing to find as a mitigating factor an extenuating relationship between Inna and Defendant.

Defendant further argues that *Mixion* supports his contention that he acted under a strong provocation. We note that, in *Mixion*, the trial court apparently found that the defendant had acted under a strong provocation, though that point was discussed only in passing and was not the subject of the appeal. *Mixion*, 110 N.C. App. at 152, 429 S.E.2d at 371. Our Court has held that: "Strong provocation means the defendant did not act in a state of 'cool [] blood.' " *State v. Pelham*, 164 N.C. App. 70, 83, 595 S.E.2d 197, 206 (2004) (quoting *State v. Deese*, 127 N.C. App. 536, 538-39, 491 S.E.2d 682, 685 (1997)).

In *Deese,* we noted that "evidence tending to show that the victim threatened or challenged the defendant is relevant in determining the existence of provocation." *Deese,* 127 N.C. App. at 539, 491 S.E.2d at 685 (citations omitted). As with an "extenuating relationship," "[t]he legislature has provided this statutory mitigating factor to reduce a defendant's culpability when circumstances exist that 'morally shift part of the fault for a crime from the criminal to the victim.' " *Id.* (citations omitted).

In *Deese,* the victim and the defendant had a history of quarreling. *Id.* at 537, 491 S.E.2d at 683. The victim was the owner of the building in which the defendant lived and was checking the water meter. *Id.* The defendant confronted the victim, who threatened to " 'beat [the defendant's] [a–]' with a metal cane." *Id.* When the victim approached the defendant, the defendant went inside his apartment to retrieve a loaded shotgun. *Id.* The victim began to walk away towards his car, but when the defendant returned with the gun, the argument began again. *Id.*, 491 S.E.2d at 684. The victim approached the defendant with the metal cane raised and the defendant shot the victim, killing him. *Id.* at 537-38, 491 S.E.2d at 684.

In this case, there was no evidence suggesting that Inna physically threatened or challenged Defendant in any manner. The only threat or challenge she made to Defendant was the threat to commit further adultery and the threat to report him to law enforcement as an abuser. Considering our prior case law, and the facts of this case, we find no evidence which would " 'morally shift part of the fault for a crime from the criminal to the victim.' " *Id.* at 539, 491 S.E.2d at 685 (citations omitted). We therefore find that the trial court did not err by failing to find as a mitigating factor that Defendant acted under strong provocation.

No error.

Judges WYNN and BRYANT concur.