IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA22-781

Filed 05 July 2023

Guilford County, Nos. 17CRS078138-39, 17CRS024529, 20CRS071708

STATE OF NORTH CAROLINA

v.

EDWARD JORGE GARDNER

Appeal by Defendant from judgments entered 13 September 2021 and 13 October 2021 by Judge David L. Hall in Guilford County Superior Court. Heard in the Court of Appeals 25 April 2023.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Tamara S. Zmuda, for the State-Appellee.*
>
> *Cooley Law Office, by Craig M. Cooley, for Defendant-Appellant.*

COLLINS, Judge.

Edward Jorge Gardner ("Defendant") appeals from judgments entered upon jury verdicts of guilty of second-degree murder and burning personal property and Defendant's guilty pleas to attaining habitual felon status and possession of a telephone by an inmate. Defendant argues that the trial court erred by refusing his request for a jury instruction on the lesser-included offense of voluntary manslaughter. Defendant also includes two "non-meritorious arguments." We find no error.

## I.    Background

The evidence at trial tended to show the following:  Ralph Dunbar was a 53 year-old gay man who was HIV-positive and used dating sites to meet men.  On 9 June 2017, Dunbar told a co-worker, Eric Chavis, that he had met a man via Craigslist, was meeting him in person after work, and was nervous about the meeting.  Dunbar then met up with and spoke with that man, William Alexander.  After having a drink together, Alexander explained that he was not physically attracted to Dunbar and "not interested in doing anything with him," and the two men did not engage in any sexual activities.  Dunbar asked Alexander whether he knew anyone who would be interested in having anal sex, and Alexander named Defendant.

Alexander explained that he met Defendant through an ad for a sexual encounter posted on Craigslist and knew Defendant by the name of "Jay."  Over the course of two to three months, Alexander and Defendant had met approximately three times for sex.  During one of these meetings, Defendant wanted to have anal sex but Alexander did not.  Alexander helped Defendant post a social media ad for sex.   After Dunbar expressed excitement about meeting up with Defendant, Alexander texted Defendant to see if he was interested; Defendant responded that he was.  Dunbar and Defendant exchanged numbers and started a text conversation.

Dunbar and Defendant's text conversation lasted from 5:19 p.m. until 7:19 p.m. and contained the following messages:

[Defendant]:  Hey . . . Jay here

[Dunbar]:  How ya doin

[Defendant]:  Good . . . just woke up from a nap

[Dunbar]:  Want company?

[Defendant]:  Yes

[Dunbar]:  When?

[Defendant]:  Well I need to get up and shower first

[Dunbar]:  and I need to

[Defendant]:  He will let u take a shower there wont he?

[Dunbar]:  Probably.  What time you want me there?

[Defendant]:  Is an hour too long?

[Dunbar]:  No.

[Defendant]:  That's perfect.

[Defendant]:  Are u gonna come tho?

[Dunbar]:  K.  I'll CALL you when I'm OTW

[Dunbar]:  He'll yeah, I'm gonna come

[Defendant]: lol . . . ok

[Dunbar]:  Nice!!! What's your question?

[Defendant]:  Did you [f***] today?

[Dunbar]:  No sir . . . .

[Dunbar]:  I worked all day.  Why?

[Defendant]:  Thought yall might have

[Dunbar]:  Nope.  I was answering your ad.  He was gracious and hooked me up

[Defendant]:  Oh . . . cool

[Dunbar]:  You have lube?

[Defendant]:  Yes

[Dunbar]:  Cool.  Let me get done here.  See ya soon.

[Defendant]:  Ok . . . is that [pu***] safe?

> [Dunbar]:  Yessir.  You prefer raw?
>
> [Defendant]:  Yes
>
> [Dunbar]:  Nice!!!  Is that monster safe?
>
> [Defendant]:  Yes my [c***] is safe and clean
>
> [Dunbar]:  Cool.  Same here.
>
> [Dunbar]:  No $$ exchange, right?
>
> [Dunbar]:  No $$ exchange, right?
>
> [Defendant]:  No
>
> [Dunbar]:  Cool.  Call ya soon.
>
> [Defendant]:  Ok
>
> [Dunbar]:  I'm almost ready to leave.  What's your address?

Dunbar and Defendant then had a series of incoming and outgoing telephone calls to each other until 8:20 p.m.  Approximately six hours after setting up Dunbar and Defendant, Alexander texted Defendant to ask if he met up with Dunbar. Defendant responded affirmatively, saying that they had met and had a good time.

The following morning at approximately 5:30 a.m., Eric Simmons of the Greensboro Fire Department received a call about a fire off Falcon Ridge Road.  Upon arrival, Simmons saw a car on fire, set back about 150 feet off the road, that had been burned down to its metal frame.  While putting out the fire, Simmons pried open the locked trunk and discovered "white skeletal remains."  Simmons notified police officers on the scene of the skeletal remains and protected the scene for evidence collection.  Greensboro Police Detective Mike Matthews arrived on the scene to inspect the burned car and skeletal remains.  While conducting his inspection, Matthews noticed that the car did not have a license plate and that there was a fresh

cigarette lighter near the car. Matthews later determined that the car was a 2001 Ford Taurus and Dunbar was the owner. Matthews was also able to determine through a search of Dunbar's phone records that Defendant was the last person to call Dunbar. Detective Christa Leonard was called to the scene of the burned car and processed the following evidence: a green-in-color drink bottle; burned fabric; red melted wax; the fresh cigarette lighter first spotted by Detective Matthews; and aluminum foil. Leonard also found the remnants of a wallet found under the skeletal remains in the trunk. A portion of the wallet appeared to have Dunbar's signature on it.

On 12 June 2017, Associate Chief Medical Examiner Lauren Scott performed an autopsy on the body found in the trunk of the burned Ford Taurus. Scott determined that the body was that of Dunbar and that the cause of death was "homicidal violence of undetermined means," meaning that death was due to homicide but the body was "too disrupted, too fragmented . . . to pinpoint a specific cause of death[.]" Scott explained that Dunbar's body was too badly burned to determine any injuries caused prior to the fire but that, based upon carbon monoxide testing, Dunbar was most likely dead prior to the fire being set. Scott prepared a "blood card" of Dunbar, whereby a sample of Dunbar's blood was placed on an absorbent card for use by a lab for further sampling, and Scott gave it to Detective Leonard.

On 19 June 2017, Leonard assisted with a search of an apartment where

Defendant sometimes lived with his girlfriend of 10 years, Ashea Francis. In the apartment, Leonard found Defendant's driver's license and discovered that a four-by-four section of the carpet had been irregularly cut out. Around the cut-out section, there were spots where it looked like bleach had been poured onto the carpet. Under the new pieces of carpet and padding, the concrete floor had "reddish brown stains" on it. Leonard took an evidence swabbing of the reddish brown stains, but there was insufficient DNA on which to conduct an analysis. Leonard then discovered another stain on the linoleum floor at the base of the stairs, which appeared to be a blood stain, and took an evidence swabbing of the stain. The swabbing matched Dunbar's DNA. Leonard found a new roll of carpet in the master bedroom of the apartment and also found a carpet cleaning machine in the closet. Leonard took evidence swabbings from a reddish-brown substance found in the intake nozzle and inside basin of the carpet cleaning machine; both swabbings matched Dunbar's DNA. Later that same day, Sergeant John Ludemann went to another apartment where Defendant was located and executed a search warrant. While executing the warrant, Ludemann placed Defendant into handcuffs and noticed "significant burn marks" on Defendant's left arm and wrist.

Defendant's girlfriend, Francis, testified that Defendant sometimes lived with her and sometimes lived with his mother. Francis was not aware that Defendant engaged in sexual relations with men. Francis was out of town during the dates of 8-10 June 2017, but she testified that Defendant had been in Greensboro and had

access to her apartment during that time. Francis noticed the burns on Defendant's arm and asked Defendant about the burns; he told her that he got them from work. Francis did not cause the burns on Defendant's arm. Francis testified that she did not remove the four-by-four section of carpet in her apartment and did not give Defendant permission to remove the carpet. Francis also explained that she owned the carpet cleaner but had never cleaned up blood with it.

Special Agent Harrison Putnam, with the Federal Bureau of Investigation, was tendered and accepted by the trial court as an expert witness in cell phone site record analysis. Putnam analyzed Dunbar's and Defendant's cell phone records and reported his findings in Exhibit 128. His report indicated that, on the night of 9 June 2017, Defendant's and Dunbar's cell phones connected at least four calls between 7:00 p.m. and 9:00 p.m. Defendant's first call, made at 7:20:42 p.m., was placed to Dunbar's cell phone and connected with a cell site close to the Francis residence. Dunbar's cell phone records indicate a corresponding call with Defendant, connecting at approximately 7:20:44 p.m., and that Dunbar's cell phone connected with a cell site close to Dunbar's residence. Defendant made another call to Dunbar's cell phone at 8:06 p.m., and Defendant's cell phone connected with a cell site close to the Francis residence. Dunbar's cell phone records indicate a corresponding call with Defendant's at 8:06 p.m. and that Dunbar's cell phone connected with a cell site "south-southwest of the [Francis] residence." Dunbar then made two calls to Defendant's cell phone, one at 8:16 p.m. and another at 8:20 p.m., and those calls "used the same cell site"

"that is nearest to the [Francis] address." Defendant's cell phone records indicate two corresponding calls with Dunbar at 8:16 p.m. and 8:20 p.m. and that Defendant's cell phone connected with a cell site close to the Francis residence. Putnam explained that the 8:16 p.m. and 8:20 p.m. calls between Dunbar and Defendant "used a cell site that is closer to the vicinity of the [Francis] residence[.]" After the 8:20 p.m. call, Dunbar's cell phone activity ceased. Defendant placed another call at 3:38 a.m., and his cell phone connected with a cell site that was southeast of the Francis residence and located in the general area of where the car fire was located.

Defendant was indicted in July 2017 and April 2020 on the charges of: (1) first-degree murder; (2) burning personal property; (3) having attained habitual felon status; and (4) possession of a telephone by an inmate. The charges of first-degree murder and burning personal property came on for jury trial on 30 August 2021. At the charge conference, the trial court indicated it would charge the jury on first-degree and second-degree murder. Defendant requested the trial court instruct the jury on voluntary manslaughter; the trial court denied Defendant's request. The trial court noted Defendant's objection to this ruling and stated that it was "preserved for appellate review[.]" Three days later, the jury found Defendant guilty of second-degree murder and of burning personal property. Following the jury's verdict, Defendant pled guilty to attaining habitual felon status and possession of a telephone by an inmate.

Defendant was sentenced as a record level IV offender. The trial court imposed

an active sentence of a minimum of 360 months' imprisonment on the second-degree murder conviction and ordered Defendant to pay $4500 in restitution. The trial court consolidated the burning personal property, habitual felon, and possession of a telephone by an inmate convictions, sentencing Defendant to 60-84 months' imprisonment, to begin at the expiration of the second-degree murder sentence. Defendant gave notice of appeal from his second-degree murder and burning personal property convictions.

## II. Discussion

### A. Jury Instruction

Defendant first argues that the trial court erred by denying his request to charge the jury on voluntary manslaughter.

We review a trial court's decision regarding jury instructions de novo. *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009). A trial court must give a requested jury instruction only if it is "correct in itself and supported by [the] evidence." *State v. Locklear*, 363 N.C. 438, 464, 681 S.E.2d 293, 312 (2009) (quotation marks and citation omitted). "A jury must be instructed on a lesser included offense only when evidence has been introduced from which the jury could properly find that the defendant had committed the lesser included offense." *State v. Woodard*, 324 N.C. 227, 232, 376 S.E.2d 753, 756 (1989) (citation omitted). When determining whether the evidence supports a jury instruction on a lesser-included charge, the trial court must consider the evidence in the light most favorable to the defendant. *State v.*

*Clegg*, 142 N.C. App. 35, 46, 542 S.E.2d 269, 277 (2001).

"First-degree murder is the unlawful killing—with malice, premeditation and deliberation—of another human being." *State v. Arrington*, 336 N.C. 592, 594, 444 S.E.2d 418, 419 (1994) (citations omitted). Second-degree murder is the unlawful killing of another human being with malice but without premeditation and deliberation. *State v. Arrington*, 371 N.C. 518, 523, 819 S.E.2d 329, 332 (2018) (citation omitted). Voluntary manslaughter is a lesser included offense of first-degree and second-degree murder. *See State v. Wrenn*, 279 N.C. 676, 681-82, 185 S.E.2d 129, 132 (1971). "In order to receive an instruction on voluntary manslaughter, there must be evidence tending to show a killing was committed in the heat of passion suddenly aroused by adequate provocation, or in the imperfect right of self-defense." *State v. Simonovich*, 202 N.C. App. 49, 53, 688 S.E.2d 67, 71 (2010) (quotation marks, brackets, and citations omitted).

Here, Defendant argues that the evidence tended to show that he acted in the heat of passion but does not assert that the evidence tended to show that he acted in imperfect self-defense.

To receive an instruction based on a theory of heat of passion, there must be evidence that: (1) defendant committed the act "in the heat of passion; (2) defendant's passion was sufficiently provoked; and (3) defendant did not have sufficient time for his passion to cool off." *State v. Bare*, 77 N.C. App. 516, 522-23, 335 S.E.2d 748, 752 (1985) (citation omitted). These elements may be shown by the State's evidence or by

the defendant's evidence. *Id.* Mere speculation as to the elements is not sufficient. *State v. Gary*, 348 N.C. 510, 524, 501 S.E.2d 57, 67 (1998).

Here, no evidence in the record supports a finding that Defendant acted "in the heat of passion." The evidence presented tended to show that Dunbar and Defendant texted about meeting to potentially have sex, but no evidence tended to show the two actually had sex. The evidence further showed that Dunbar did not disclose his HIV-status to Defendant via text, and instead responded yes when asked if he was "safe." While the record shows that Dunbar was HIV-positive, no evidence tended to show that Dunbar told Defendant he was HIV-positive, or that Defendant learned of this HIV-status and became angry.

Defendant theorizes that a juror "could've concluded that [Defendant] had penetrative anal sex with Dunbar" and "could've reasonably concluded [Defendant] was significantly concerned about having unprotected sex with another man who had an STD or HIV," and that this could have caused Defendant's "actions to spawn suddenly and passionately." These claims are pure speculation and are not sufficient. *See id.* Further, the record is devoid of evidence that Defendant's passion was sufficiently provoked. Additionally, Defendant does not address in his brief whether evidence tended to show sufficient time for his passions to cool.

As there was no "evidence tending to show a killing was committed in the heat of passion suddenly aroused by adequate provocation," the trial court did not err by refusing to give the instruction on the lesser-included offense of voluntary

manslaughter. *Simonovich*, 202 N.C. App. at 53, 688 S.E.2d at 71 (quotation marks, brackets, and citation omitted).

## B. Non-meritorious arguments

Defendant makes two other "non-meritorious arguments" on appeal, asserting that (1) the record evidence was not "clear and positive regarding second-degree murder" and (2) the trial court's "inference stacking holding is wrong."

### 1. Second-Degree Murder

Defendant argues that the State's evidence was not clear and positive as to the element of malice.

"Where the State's evidence is positive as to each element of the offense charged and there is no contradictory evidence relating to any element, no instruction on the lesser included offense is required." *State v. Thomas*, 325 N.C. 583, 594, 386 S.E.2d 555, 561 (1989) (citation omitted). "Second-degree murder is the unlawful killing of another person with malice, but without premeditation and deliberation." *State v. Cozart*, 131 N.C. App. 199, 203, 505 S.E.2d 906, 909 (1998) (citations omitted). Our Courts recognize three theories of proof of malice: (1) "express hatred, ill-will, or spite"; (2) an act inherently dangerous to human life that is done "in such a reckless and wanton manner as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief"; or (3) "a condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification." *State v. Coble*, 351 N.C. 448, 450-51, 527 S.E.2d 45, 47 (2000)

(quotation marks and citation omitted). Malice is a state of mind and thus rarely proven with direct evidence; it is ordinarily proven by circumstantial evidence from which malice may be inferred. *State v. Sexton*, 357 N.C. 235, 238, 581 S.E.2d 57, 58 (2003). Malice may be inferred by the nature of the crime and the circumstances of the victim's death. *See State v. Rick*, 126 N.C. App. 612, 618, 486 S.E.2d 449, 452 (1997) (inferring implicit malice from the nature of the crime where the defendant was seen driving alone in the victim's car; the victim's house was in disarray; marks on the ground in the victim's backyard matched the same dimensions as the cement block that was used to weigh down the victim's body in water; and defendant left a note for a friend saying that he intended to kill himself because he had done something bad).

Here, as in *Rick*, implicit malice can be inferred by the nature of the crime and the circumstances of Dunbar's death: Dunbar's car was taken about 150 feet off of the road and set on fire; Dunbar's body was locked in the trunk of the car and burned down to its skeletal remains; the license plate was removed from the car; Dunbar's blood was found in Francis' residence where Defendant would stay and where his driver's license was found; a four-by-four section of the carpet had been removed and replaced with new carpet and padding; there were bleach and blood stains found under and around the replaced carpet; and a carpet cleaning machine, located in Francis' residence, contained Dunbar's DNA in the intake nozzle and inside basin. This evidence supports the element of malice.

## 2. *Inference Stacking*

Defendant asserts that the trial court erred in refusing to charge voluntary manslaughter "because – from its perspective – it required too many inferences." While it is true that the trial court stated, "I stand by my legal reasoning that I may not base – a charge may not be based upon one inference layer[ed] upon another[,]" the trial court did not base its refusal to give a voluntary manslaughter instruction solely on inference stacking. The trial court explained that there was not "a scintilla of any such" evidence to support such an instruction and that any offense other than first-degree and second-degree murder would be "built upon the absence of evidence[.]" We agree that no evidence presented at trial tended to show and support an instruction on voluntary manslaughter, as there was no evidence presented of the element of heat of passion, and thus the trial court did not err by refusing to charge the jury on the lesser-included offense of voluntary manslaughter.

## III.   Conclusion

As no evidence tended to show that "a killing was committed in the heat of passion suddenly aroused by adequate provocation," the trial court did not err by refusing to instruct the jury on the lesser-included offense of voluntary manslaughter. *Simonovich*, 202 N.C. App. at 53, 688 S.E.2d at 71 (quotation marks, brackets, and citations omitted).

NO ERROR.

Judges TYSON and RIGGS concur.